IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **JOHN DOE & JANE DOE,** | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Action No. 1:16-CV-00225-PB |
| **ST. PAUL'S SCHOOL,** | * | |
| *Defendant*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' REPLY TO DEFENDANT'S PARTIAL OBJECTION AND
CONDITIONAL ASSENT TO PLAINTIFFS' MOTION
FOR LEAVE TO PROCEED UNDER PSEUDONYMS**

Plaintiffs John and Jane Doe, as parents, next friends, and legal guardians of their minor daughter J.D., by and through their undersigned counsel, hereby reply to Defendant's Partial Objection and Conditional Assent to Plaintiffs' Motion for Leave to Proceed under Pseudonyms (the "Objection") [ECF No. 14] and state as follows.

I. **INTRODUCTION**[1]

Defendant St. Paul's School ("SPS") says "fundamental fairness" requires that the child-victim of a proven sexual assault on its campus remain muzzled throughout this proceeding — just as she has for more than two years as her rapist, and the school that fostered and tolerated the toxic environment that led to the rape, engaged in a wide-ranging publicity campaign designed to intimidate her and her family and to undermine their credibility. SPS and its well-financed public-relations team has spared no expense in seeking to shield itself from any responsibility for a sexual assault that, as a jury concluded, student Owen Labrie committed on campus as part of

---

[1] The citations substantiating the facts set forth in this Section are contained in Section II below.

1

an insidious school tradition – a tradition of which Rector Michael Hirschfeld was aware and did nothing to stop. The school now renews those efforts by, again, smearing the victim and, again, demonstrating that it has no interest in the safety, privacy, or well-being of female children that are or were in its care.

Yet even the most talented (and expensive) spin doctors cannot help SPS here, for two primary reasons. First, SPS' Objection rests upon a misstatement of the law. SPS does not seem to grasp that J.D. is a *minor* whom Plaintiffs *are forbidden* from naming in the Complaint and whom Defendant is forbidden from naming in *any* pleading. Recognizing the strong public interest in protecting children, federal courts have widely permitted parents to use pseudonyms where, as here, the use is necessary to protect the identity of a minor. That essential fact dispositively distinguishes this case from *every* case Defendant cites in its briefs, including *Doe v. Cabrera.*[2]

Second, SPS puts facts exactly backwards; it is SPS, not the Plaintiffs, who engaged in a "carefully orchestrated media campaign." SPS spent a considerable portion of its more than $730 million in assets to assemble a crisis response and communication team tasked with spinning the facts to conjure a more positive portrayal of the school in the media throughout the criminal trial. Among other things, the school:

- Retained Michael Delaney, Esq., to act as the school's "counsel" during the criminal trial. Delaney and his "witness coordinator" were observed meeting with

---

[2] *Doe v. Cabrera*, 307 F.R.D. 1 (D.D.C. 2014) involved sharply contrasting facts that render Defendant's attempt to align the cases utterly unconvincing. Most importantly, that claim was brought by an adult woman against an individual defendant, thus implicating a far different balancing test than that of a minor against an institutional defendant. Moreover, in *Cabrera,* no criminal charges were ever brought, and the filing of the civil suit constituted the only publicity of any kind regarding the allegations. In raising concerns about pretrial publicity, the court was responding to — in addition to comments made by counsel — statements made by the plaintiff herself and by her various advocates, none of which are at issue in this case.

2

current and former students as a group prior to their testimony at trial. Following the meeting, the former students gave virtually identical testimony, using the same stilted "buzz words" that closely mirrored related SPS press releases, as well as letters and messages from the Rector and the school's trustees;

- Hired Madison Avenue crisis communications expert Jeffrey Z. Taufield, who advertises that he specializes in guiding large companies through "sensitive reputational matters and situations" including, for instance, advising Swiss banks "during the multi-year investigations into 'hidden assets' from World War II;"

- Hired Boston-based communications firm The Castle Group to "manage communications" throughout the criminal proceedings;

- Created a communications office with a full-time staff of five; and

- Enlisted former students and alumni to support Labrie and to attack J.D. and her family.

For more than two years, SPS has controlled the public narrative of a sexual assault suffered by a child-victim placed in the school's care. SPS' public-relations machine generated numerous press releases and issued near-constant statements to parents, faculty, and others "spinning" the facts at every stage of the criminal case, all designed to insulate the school, deflect responsibility, and cast doubt on the child-victim's credibility. Every press release, parent letter, rector's message, or "talking points" memo relied on carefully crafted buzz words designed to deflect the school's responsibility, all at the expense of J.D. and often at the expense of the truth.

Indeed, despite defense counsel's complaints about not receiving a copy of the Complaint for hours after its filing, and thus being unfairly prejudiced in his ability to respond to media

inquiries,[3] SPS' public-relations machine produced a strongly-worded response to the lawsuit a mere 30 minutes after it was filed, stating that the Complaint was "without merit," vowing to "vigorously defend ourselves," and "categorically" rejecting any "allegations that St. Paul's School has an unhealthy culture." That press release was quoted and otherwise relied upon by the media throughout the single news cycle during which SPS hyperbolically claims that Plaintiffs instituted a "massive campaign."

On top of this, SPS allowed its network of wealthy parents and alumni to come to the aid of the now-convicted rapist by funding his efforts to attack and intimidate his victim. After Labrie accessed SPS' alumni network in search of the money necessary to hire a high-powered criminal-defense lawyer, prominent SPS parent Joshua Abram wrote to other prominent parents and alumni and raised more than $100,000 to hire Jay Carney. Mr. Carney used the national media as a major component of his strategy, unleashing a constant stream of statements concerning the case and J.D., the child-victim. A simple Google search of the terms "Jay Carney" and "Owen Labrie" yields 23,800 results of news stories, videos and related postings. Although SPS knew Abram and Labrie were using its network in this manner, SPS did nothing to condemn it, or even refuse to endorse it. No one at the school undertook the slightest effort to raise a *penny* for Labrie's victim, whose family was forced to spend tens of thousands of dollars on counseling, travel, and many other expenses related to the assault.

SPS' suggestion that the media surrounding this case was ginned up by publicity-seeking plaintiffs' lawyers is entirely off-base. Serious questions about the flawed and toxic culture of the school were discussed by national media outlets long before this assault.[4] Prosecutors and

---

[3] *See* Obj. at 3-5.
[4] *See, e.g.,* Alex Shoumatoff, *A Private School Affair*, Vanity Fair, January 2006, available at http://www.vanityfair.com/news/2006/01/st-pauls-school200601.

4

Labrie's defense attorneys in the criminal trial revealed facts concerning the "Senior Salute" tradition, the "scoring" culture at SPS, and other details about the events leading to the sexual assault.

Journalists throughout the country, including prominent SPS alumnus Todd S. Purdum[5], naturally raised questions about SPS' culture based on these revelations. SPS' culture and the appalling manner in which the school has treated the child-victim and her family also fits into a much broader national dialogue about how high schools are failing sexual-assault victims.[6] In fact, Plaintiffs' counsel Steven Kelly — the same attorney to whom SPS directs considerable unwarranted ad hominem attacks — has devoted significant volunteer efforts to assist organizations working to prevent sexual assault and improve the way sexual assault survivors are treated. Such public-interest advocacy groups include the National Crime Victim Law Institute, the Victim Rights Law Center, SurvJustice, PAVE, and others that, in connection with Vice President Joe Biden, the White House, and other policymakers, changed laws and policies to strengthen high-school sexual assault survivors' rights and to increase oversight to ensure federally-funded schools take sexual assault seriously and provide them with the accommodations and support services to which they are legally entitled.[7] This case only underscores how desperately these improvements are needed.

---

[5] *See* Todd S. Purdum, *Dangerous Privilege,* VANITY FAIR, March 2016, attached as **Exhibit A**.

[6] *See* Tierney Sneed, *High Schools and Middle Schools are Failing Victims of Sexual Assault*, U.S. NEWS & WORLD REPORT, Mar. 5, 2015, *available at* http://www.usnews.com/news/articles/2015/03/05/high-schools-and-middle-schools-are-failing-victims-of-sexual-assault.

[7] SPS' attack on the motives and character of Plaintiffs' counsel is baseless. Mr. Kelly, a former commercial litigator with DLA Piper and Maryland's largest business law firm, became involved in the movement for crime-victim rights following the brutal rape and murder of his sister when he was 14 years old. He has since devoted his life to fighting for crime victims and donates hundreds of hours each year to representing victims of crime pro bono. For instance,

SPS and its attorneys have acknowledged that this case fits into a broader discussion about high school sexual assault. Well in advance of this lawsuit's filing, SPS and its attorneys used the case's wide notoriety to promote SPS and law firm McLane Middleton as having special expertise in handling student-on-student sexual assault. Indeed, the school and firm actually hosted a seminar for other elite private schools in New England, advertising the event with materials that speak glowingly of the case being "all over the news" and lament the case's "effect on the school." Unsurprisingly, the materials are silent on the effect on the child-victim whose life has been shattered by the very "case" they were promoting and the school's callous response to her.

For more than two years, J.D. and her family largely remained silent to avoid tainting the state prosecutors' work to convict Labrie. A New Hampshire jury found Labrie guilty of a statutory rape as part of the "Senior Salute" tradition on the SPS campus, and convicted him on related misdemeanor and felony charges. The sentencing judge said that it was apparent to him that the sexual contact was not consensual. J.D.'s victim impact statement recounted the devastating effect of the barrage of attacks unleashed upon her by Labrie and SPS — attacks that led to her being bullied, intimidated, and forced to leave SPS early.

For the first time in more than two years, the child-victim and her family had public statements made on their behalf — and only during one single news cycle that corresponded with

---

Kelly recently won a major first amendment victory for crime victims in the Connecticut Supreme Court by reversing a trial court's tort award against the family of a murder victim for putting up missing person's posters that a criminal suspect in the victim's disappearance found offensive. *See Gleason v. Smolinski,* 125 A.3d 920 (Conn. 2015). Kelly was appointed by different Maryland Governors to chair the Maryland State Board of Victim Services and to serve as a commissioner on the the Maryland Criminal Injuries Compensation Board. Kelly also serves on numerous national, state and local non-profit boards, has testified in various state legislatures and the U.S. Congress on crime victim issues, is a permanent member of the Judicial Conference for the Fourth Circuit of the U.S. Court of Appeals and sits on the Board of Governors for the Maryland Chapter of the Federal Bar Association.

the lawsuit's filing. Those comments reflect J.D.'s and her parents' disappointment that a purportedly religious institution, which three members of her family had attended, treated her so aggressively and badly. Nothing that Plaintiffs' counsel said was inflammatory or false. None of the statements were issued by the Plaintiffs themselves or the child-victim. And the scope of the accompanying news coverage pales in comparison to the prolonged campaign employed by SPS' public-relations machine. In seeking to have this Court essentially issue a gag order, SPS wishes to get the benefit of years of favorable spin — spin for which SPS paid handsomely — while limiting the public expression of the victim's viewpoint to at best, a few days of news stories.

The Objection is just the latest example of the school's serial attempts to bully a child to whom it owed a legal and moral duty of care. The idea that the *teenaged sexual assault victim* and her family have "carefully plan[ned] and execut[ed]"[8] a media campaign against the *$730-million elite prep school* with Madison Avenue crisis consultants, public-relations firms, sophisticated law firms, and its own five-person communications office is farcical, to put it charitably. The school has failed to establish that it has been prejudiced in any meaningful way, or that "outing" the teenaged sexual assault victim would remedy its imagined prejudice.

J.D. and her family have carefully reviewed the Objection and they see it for what it is — an attempt to intimidate a teenaged girl and her family by threatening further public exposure while demanding silence and other unreasonable conditions. J.D. and her family could not disagree more with SPS' characterization of the facts or the "fairness" of this situation. However, just as J.D. has been attacked, shamed, blamed and pushed into the shadows by so many — including SPS — she has found community with other sexual assault survivors who have supported her, encouraged her and have helped her to find her voice. Through this community of

---

[8] *See* Obj. at 2.

7

survivors, J.D. has come to understand that she does not deserve to be bullied, shamed, and shunned into isolation. And she has determined that she will not let SPS — or anyone else — rob her of the voice she has struggled so hard to claim. For herself and for the survivors who expressed doubt in the face of SPS' tactics, J.D. has elected to come forward and be identified in this case.

Accordingly, J.D. and her parents have instructed the undersigned counsel to withdraw Plaintiffs' Motion to Proceed under Pseudonyms [ECF No. 2], rendering the Objection moot. Shortly after this filing, and within the time for filing an amended complaint as a matter of right pursuant to Fed. R. of Civ. Proc. 15(a)(1)(B), Plaintiffs will amend their Complaint. The Amended Complaint will identify the parties by their real names (yet continuing to use J.D.'s initials, as is required by the Federal Rules). Nonetheless, SPS' positions and arguments in the Objection reveal a strategy to publicize unseemly characterizations of J.D., her family, and her lawyers, and also reveal a profound disrespect of the sensitive treatment it should give to minors (and especially minors that are or were within its care). With an eye toward SPS' future conduct in this litigation, Plaintiffs explain the inappropriateness of these approaches below.

## II.   RELEVANT FACTUAL/PROCEDURAL BACKGROUND

### A.   THE CRIMINAL PROCEEDINGS

Labrie was an 18-year-old senior at SPS when, on May 30, 2014, he took J.D., a then 15-year-old freshman, to a secluded machine room (for which he had received stolen keys) and sexually assaulted her as part of the "Senior Salute" tradition. J.D. reported the assault to police on June 3, 2014. On July 16, 2014, Labrie was arrested and charged with: (a) three counts of aggravated felonious sexual assault; (b) three counts of misdemeanor sexual assault; (c) one

count of endangering the welfare of a child; (d) one count of the felony of "certain uses of computer services prohibited"; and (e) one count of simple assault.

A two-week jury trial was held before the Hon. Larry Smukler of the Merrimack County Superior Court, during which J.D. testified and was harshly and lengthily cross-examined by Mr. Carney. The trial was covered by every major national news outlet and each day the child-victim was forced to walk through a cluster of cameras and news trucks on her way into court. The child-victim described feeling so anxious about the trial that she threw up several times per day. Despite the large number of paid SPS officials on site, no one from SPS offered the child-victim any assistance whatsoever. On August 28, 2015, a jury found Labrie guilty of three counts of misdemeanor sexual assault, one count of the felony of "certain uses of computer services prohibited," and one count of endangering the welfare of a child. At sentencing, Judge Smukler noted that just because the jury found that J.D. may not have successfully communicated lack of consent does not mean that she consented: "Indeed, it is clear from the impact of this crime that she did not."[9]

### B. SPS BUILDS A HIGH-PRICED PUBLIC-RELATIONS MACHINE TO DEFLECT QUESTIONS ABOUT ITS CULTURE

Shortly after Labrie's arrest, SPS and its officials, such as Rector Hirschfeld, began commenting publicly on the case, including comments in an August 8, 2014, article which also quoted an SPS student as saying that "St Paul's is the best thing that ever happened to me; it changed my life."[10] Hirschfeld's statements were widely quoted by many news sources. The

---

[9] Jess Bidgood, *Owen Labrie Gets Year In Jail for St. Paul's School Assault*, N.Y. TIMES, Oct. 29, 2015, *available at* http://www.nytimes.com/2015/10/30/us/owen-labrie-st-pauls-school-sentencing.html?_r=0.

[10] *See* Evan Allen, *Assault case has elite St. Paul's examining school's culture,* BOSTON GLOBE, Aug. 8, 2014, attached as **Exhibit B.**

9

school also began assembling a public-relations team to work lockstep with Rector Hirschfeld and SPS' communications office staff of five newly hired full-time employees.[11]

Early in the criminal proceedings, SPS retained Mr. Delaney and McLane Middleton to represent it.[12] Although SPS was not a party to the criminal trial and had no formal role in the proceedings, Delaney hired The Castle Group — a high-end public relations firm that boasts clients such as Hewlett Packard, Ocean Spray, and Johnson & Johnson[13] — to direct "communications during and after the proceedings."[14] Delaney also apparently hired a "witness coordinator," Sandra Matheson, who could be seen with Delaney at the courthouse meeting with former SPS student witnesses slated to testify prior to their trial testimony. *See* Aff. of John Doe ¶¶ 6-8, attached as **Exhibit C**.

Not surprisingly, the SPS witnesses testified in a nearly uniform, stilted, and illogical manner concerning the definitions of terms such as "Senior Salute," "slay," "pork," and "bone." For instance, Andrew Thomson testified that the Senior Salute could refer to anything from a "stroll around campus, a kiss, or a sexual encounter": "It was just kind of a way for people on a secluded campus to express an interest in someone else, whether it be for friendship or romantic."[15] Thomson's testimony and that of others closely tracked press releases put out by the school (some using nearly identical language). For example, a September 4, 2015, press release

---

[11] "For the Media," St. Paul's School, *available at* http://www.sps.edu/Page/About-SPS/For-the-Media.

[12] *See* "Trustees Gather on the Grounds for Their Fall Meeting," St. Paul's School, Dec. 21, 2015, *available at* http://www.sps.edu/page/News-Detail?pk=824421&fromId=188886.

[13] *See* "Our Clients," The Castle Group, *available at* http://www.thecastlegrp.com/meet-castle/our-clients.

[14] *See supra* n. 11.

[15] *See* Allison Manning, *Rape-trial defendant denies sex with girl, but friends say he told them he did it*, BOSTON GLOBE, Aug. 24, 2015, *available at* http://www.boston.com/news/local-news/2015/08/24/rape-trial-defendant-denies-sex-with-girl-but-friends-say-he-told-them-he-did-it?s_campaign=bcom:socialflow:twitter.

entitled "FAQ: Owen Labrie Trial" stated that "the phrase 'senior salute' described a wide range of behaviors related to spending time with other students[.]" *See* Copies of SPS Press Releases, attached as **Exhibit D**. That Mr. Thomson's testimony adhered so closely to the SPS party line is particularly interesting given that, in the criminal appeal, Labrie's criminal lawyers have accused SPS of making a secret deal with Thomson — whose mother was on the SPS Board of Trustees — to permit him to avoid prosecution for his own sexual misconduct.[16] SPS also enlisted the services of Mr. Taufield, a high-priced Madison Avenue "fixer," *see* Ex. C at ¶¶ 9,10 and specialist in crisis communications who regularly helps the world's largest companies handle "sensitive" matters.[17] While Mr. Taufield's precise role in managing the media in this case is unclear, he obviously has direct interaction with Mr. Delaney and the school's communications staff relating to matters that concern this litigation. *See id.*

The school continually has engaged in a public-relations effort to deflect attention away from questions about the school's culture and, instead, to raise questions about child-victim's credibility. Indeed, despite defense counsel's protestations about not receiving a copy of the Complaint until hours after it was filed, the school's communications machine was well-prepared for it, producing a press release within 30 minutes of the filing stating:

> We believe this lawsuit is without merit, and we plan to vigorously defend ourselves. We categorically reject any allegations that St. Paul's School has an unhealthy culture. The safety of our students has been and will continue to be the highest priority for our School.[18]

---

[16] *See* Dave Solomon, *Owen Labrie lawyers argue better-connected students not prosecuted including son of Hassan legal counsel*, NEW HAMPSHIRE UNION LEADER, May 10, 2016, *available at* http://www.unionleader.com/courts/owen-labrie-lawyers-argue-better-connected-students-not-prosecuted-included-son-of-hassan-legal-counsel-20160510.

[17] *See* "Jeffery Z. Taufield," KEKST, *available at* http://www.kekst.com/our-team/team-bios/jeffrey-z-taufield.php.

[18] St. Paul's School, *Statement from St. Paul's School*, Jun. 1, 2016, available at http://www.sps.edu/page/News-Detail?pk=857491&fromId=207260.

That statement was widely quoted in the media stories cited in the Objection, thereby undermining SPS' claims of surprise and prejudice.

The school's expensive public-relations apparatus also issued regular communications to parents, and Rector Hirschfeld, members of the faculty, and members of the Board of Trustees spoke publicly about the sexual assault on a regular basis. Some of the many such examples are attached as **Exhibit E**. Mr. Delaney and his firm have also engaged in public discussions about this case. Just three months after the trial that deeply traumatized J.D. and sent one of SPS's star, Rector's Award-winning students, to jail, Mr. Delaney and his firm promoted and conducted a workshop entitled: "Strategies for Addressing Student-to-Student Sexual Assault." The promotional materials for the event stated:

> **It's been all over the news.** For several years, national media has reported on the incidence of student sexual assaults on college and university campuses, and the federal government's response in mandating enhanced policies, procedures, training and reporting. **Earlier this year, the spotlight turned to New Hampshire as the trial of a senior boy at a New Hampshire independent school** unfolded and resulted in guilty verdicts for sexual assault and certain computer crime law violations. In this dynamic session, you will hear from Attorney Michael Delaney about what crimes the student was charged with, what he was found guilty of**, and what implications this has for students and schools.** You will also hear from Rector Michael Hirschfeld as he discusses the impact the trial has had at St. Paul's School and what the school is doing to address it. And finally, you will hear from Attorney Linda Johnson who will provide some overall strategies for schools to address student on student sexual assault situations, both proactively and reactively. You won't want to miss this![19]

Ex. E (emphasis supplied). Messrs. Delaney and Hirschfeld saw fit not only to speak publicly about this case but also to instruct other schools on how to "handle" similar cases.

---

[19] "ISANNE Fall 2015 Heads Conference," ISANNE, *available at* http://www.isanne.org/event/isanne-fall-2015-heads-conference (emphasis supplied).

C.  **SPS USES FORMER STUDENTS TO SELL ITS MESSAGE**

SPS also worked closely with its former students to tout its virtues in the media. Several members of the class of 2015 worked closely with SPS' communication team[20] to draft an editorial that, among other things, repeats the supposedly exculpatory buzz words the team has crafted to characterize the senior salute. *See* Sept. 8, 2015, editorial, attached as **Exhibit G**. One of the signatories to the editorial was, ironically, Paul Kigawa — himself a "Slaymaker" to whom Owen Labrie passed down the stolen keys to the school property where he sexually assaulted J.D. *See* Ex. C ¶ 12.

D.  **SPS COMMUNITY FUNDS RAPIST'S ATTACKS ON UNDERAGE VICTIM**

Even more troubling, SPS allowed Labrie to use its public-relations machinery to launch a barrage of hate-filled attacks on an innocent victim of sexual assault. In direct contravention of Labrie's terms of pretrial release, SPS permitted — and at minimum never refused to condone — his launch of a letter-writing campaign to wealthy SPS alumni accusing J.D. of lying and seeking funds to pay for his legal defense. A copy of Labrie's February 19, 2014, letter is attached as **Exhibit H**.

Prominent SPS parent Joshua Abram sent a message through the school's alumni network to prominent parents, alumni and others in the SPS network that successfully raised the funds to pay for Mr. Carney's services. *See* February 23, 2015, e-mail from Joshua Abram, attached as **Exhibit I**. While J.D. and her family were instructed to say and do nothing during the long lead-up to and through the criminal trial itself, Labrie and his attorneys were engaged in a widespread

---

[20] *See* Facebook postings noting the editorial has been "approved by SPS Communications," and containing language carefully tracking the "buzz words" contained throughout official SPS public relations materials, attached as **Exhibit F**.

media assault. A simple search for stories involving Labrie and his attorneys turns up more than 7,000 published articles and videos. *See* Aff. of Desirena Farmer, attached as **Exhibit J**.

Labrie and his supporters have attacked J.D. by posting her name, home address, and family pictures to the internet. Examples of the vulgar, obscene, and threatening online postings about J.D. and her family, redacted versions of which are included below, include:

a. pictures of J.D. with her then-7-year-old sister;

b. family photographs;

c. detailed pictures of J.D.'s family home along with its street address and estimated value;

d. her being labeled an "attention whore at St. Paul's score who lied to slime an innocent bro with a fake-rape charge";

e. a threat indicating, "i know my ivy frat bros are putting a target on her, she is gonna get used and abused"; and

f. an entry indicating the writer's "hope she gets a bit of desperately needed backdoor action."





### E. SPS SUCCESSFULLY SHIELDS ITSELF FROM UNWANTED MEDIA SCRUTINY

Not surprisingly given its level of sophistication, the SPS public-relations machinery has proven itself skilled in keeping the school out of unflattering news. On November 22, 2015, an

SPS senior and star hockey player[21] struck and killed a couple from Hillsborough, N.H., in an accident off of Route 9 in New Hampshire.[22] Media accounts identify the player only as being from "Farmington, New York." Press accounts fail to mention his affiliation with SPS or the school policy against students having cars on campus, from which Rector Hirschfeld apparently made an exception for the player.

### III. SPS ATTEMPTS TO MISLEAD THE COURT INTO TREATING THE CHILD-VICTIM AS AN ADULT

The fundamental flaw in the Objection's legal arguments is failing to recognize that the victim on whose behalf this case is brought is a minor who is suing a (wealthy) institutional defendant in connection with a crime of sexual violence. SPS either willfully or intentionally ignores the great body of law favoring protection of the privacy of minors in precisely this type of suit. Although Plaintiffs' ceasing to use pseudonyms may moot the specific context in which SPS seeks to violate J.D.'s privacy, she will nonetheless continue to use initials in the lawsuit.

SPS first notes that Fed. R. Civ. P. 10(a) requires that a complaint provide the names of the parties, *see* Obj. at 8, and posits that "generally … the potential prejudice to defendants outweighs the plaintiff's interest in remaining anonymous at trial." *Id*. at 13. At the same time, SPS laments that Plaintiffs have proceeded in this lawsuit "shrouded in anonymity," and attacks their lawyers as concealing J.D.'s identity as part of a "coordinated, tactical maneuver." *Id.* at 2, 9. SPS declares that the "key to assessing the credibility" of J.D. is to publicly reveal her identity. *Id.* at 7. SPS then warns that it "will likely need to publicly file with the Court,

---

[21] "Boys Varsity Hockey," St. Paul's School, *available at* http://www.sps.edu/page/Team-Detail?fromId=188972&Team=7119&SeasonLabel=2015+-+2016.

[22] Paul Feely, *Couple Killed in SUV Collision on Route 9*, NEW HAMPSHIRE UNION LEADER, Nov. 22, 2015, *available at* http://www.unionleader.com/Couple-killed-in-Antrim-crash.

16

throughout the course of the litigation, deposition transcripts or other materials with Plaintiffs' names or other personally identifiable information." *Id.* at 13. Cautioning the Court about the "exceptional relief of remaining anonymous in this public proceeding," SPS asks the Court to require the Plaintiffs to pay its costs for respecting that anonymity. *Id.* at 8.

SPS is asking the Court to disregard Rule 5.2(c), which states that "in an electronic or paper filing with the court that contains … the name of an individual known to be a minor," the identity of the minor *must* be kept anonymous. Rule 5.2 is lockstep-consistent with courts' near-universal allowance for anonymity when the plaintiff is a minor. *See, e.g., Sam M. ex. Rel. Elliott v. Carcieri*, 608 F.3d 77 (1st Cir. 2010); *see also Doe v. North Carolina Cent. Univ.*, No. 1:98CV01095, 1999 WL 1939248 at *4 (M.D.N.C. Apr. 15, 1999); *Roe v. St. Louis Univ.*, No. 4:08CV1474, 2009 WL 910738 at *4 (E.D. Mo. 2009); *Moe v. Dinkins*, 533 F. Supp. 623 (S.D.N.Y. 1981).[23] SPS' repeated attempt to characterize its purported prejudice as equal to that of the Plaintiffs' has also been roundly rejected by courts.

As a very wealthy educational institution, SPS is substantially less prejudiced by a plaintiff's anonymity than an individual defendant would be. "Defendant is not an ordinary private party, with interests relating solely to its personal life and business reputation"; it is "organized solely to perform an important, public service" — education of children. *Cf. EW v. New York Blood Ctr.*, 213 F.R.D. 108, 112 (E.D.N.Y. 2003). Given SPS' "significant role" in its

---

[23] This Court has also long accepted granting privacy to parents so as to protect their children. *See, e.g., B.K. v. New Hampshire Dep't of Health and Human Servs.*, 814 F. Supp. 2d 59 (D.N.H. 2011); *Doreen W. v. MWV Healthcare Assocs., Inc.*, 937 F. Supp. 2d. 194 (D.N.H. 2013); *B.K. v. Toumpas*, 909 F. Supp. 2d 60 (D.N.H. 2012); *Doe v. Londonderry Sch. Dist.*, 970 F. Supp. 64 (D.N.H. 1997). Many other courts have, too. *See, e.g., Doe v. Porter*, 370 F.3d 558 (6th Cir. 2004); *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249 (N.D. Iowa 1995); *Doe v. Stegall*, 653 F.2d 180, 185 186 (5th Cir. 1981); *Doe v. Harlan Cty. Sch. Dist.*, 96 F. Supp. 2d 667 (E.D. Ky. 2000); *Yacovelli v. Moeser*, No. 1:02CV596, 2004 WL 1144183 (M.D.N.C. May 20, 2004); S*mith v. Edwards,* 175 F.3d 99 (2d Cir. 1999).

community, and in light of its nationally prominent alumni (including Secretary of State John Kerry and many other state and national politicians and public figures), "plaintiff's allegations of sexual abuse of children … raise concerns affecting a larger association rather than the interest of an individual plaintiff." *See Doe No. 2 v. Kolko*, 242 F.R.D. 193, 195 (E.D.N.Y. 2006).

Consequently, "this case is analogous to one involving a government defendant, where personal anonymity is more readily granted because of the public interest in the action and a lesser interest in personal reputation." *Cf. EW*, 213 F.R.D. at 112. SPS is well aware of the law on anonymity in court filings for sexually assaulted minors and their parents who bring claims such as those at issue here. SPS therefore concedes, as it must, that the Plaintiffs are entitled to that anonymity.

Given that well-settled law, the real purpose of SPS' response is to portray itself as a helpless victim of unscrupulous plaintiffs' attorneys. Manufacturing indignation and misplaced outrage at Plaintiffs' counsel and negative publicity may play well to SPS' concerned donor base of wealthy alumni, but it has nothing to do with the Plaintiffs' privacy. Other courts have recognized the absence of logical or legal support for such arguments. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1072 (9th Cir. 2000) ("defendants argued that they face tremendous adverse publicity as a result of this lawsuit, but do not explain how knowledge of plaintiffs' identities will enable them to counter that adverse publicity"). Courts have also met with skepticism defendants' complaints about plaintiffs' contact with the media when couched in an objection to plaintiff anonymity. *See Doe No. 2*, 242 F.R.D. at 198 ("Even assuming that anonymity increases plaintiff's ability to communicate with the press outside the courthouse, the conduct of this litigation simply is not affected."); *Doe v. Alexian Bros. Med. Ctr.*, No. 96 C 2042, 1996 WL 210074 at *2 (N.D. Ill. Apr. 24, 1996) (plaintiff's contacts with the press would

not "influence the outcome of a trial, affect the defendant's rights or prejudice this case in any way").

Plaintiffs' allegations have resulted in sizable publicity not because of anything they have done, but because SPS has spent decades actively promoting its virtues and services to the public. There is simply nothing "conflicting," Obj. at 1, about the public's widespread and legitimate interest in SPS' misconduct — as well as what that misconduct may or may not reveal about treatment of female students at elite private schools in general — and the need to shield the identity of a minor who was sexually victimized as a result of that misconduct. SPS' argument only reveals its true strategy in this litigation: not to defend its actions and omissions in this case in particular, and to show, in general,  the school culture as welcoming, hospitable, and safe for girls, but, rather, to simply smear and tarnish the character of J.D. and her family. Unfortunately for SPS, however, the law unequivocally protects Plaintiffs in these circumstances.

SPS contends that a minor plaintiff who is anonymous in a federal filing should "not be allowed to continue to wage a battle in the court of public opinion from behind a cloak of anonymity." *Id*. at 11. SPS therefore seemingly seeks to impose a new rule on federal courts that a minor plaintiff who files a lawsuit essentially does so under an automatically invoked, immediately effective, and perpetual gag order. But no basis exists, and SPS provides none, for its implicit premise that a minor plaintiff — in the absence of a specific court order — is inherently prohibited by virtue of her age from exercising her constitutionally protected right to publicly discuss her allegations. *See, e.g., Tinker v. Des Moines Ind. Community Sch. Dist.*, 329 U.S. 733, 736-37 (1969) (recognizing that minors have First Amendment rights worthy of protection); *In re Gault*, 387 U.S. 1 (1967) (accord).

### IV. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully withdraw their Motion to Proceed under Pseudonyms [ECF No. 2], thereby rendering the Objection moot. Shortly after this filing, and within the time for filing an amended complaint as a matter of right pursuant to Fed. R. Civ. Proc. 15, Plaintiffs will amend their Complaint so as to identify the parties by their real names and initials.

Respectfully submitted,

Date:  August 25, 2016

/s/ Charles G. Douglas, III_____
Charles G. Douglas, III (NH Bar. No.669)
DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH 03301
(603) 224-1988
chuck@nhlawoffice.com

Steven J. Kelly (admitted *pro hac vice*)
Steven D. Silverman (admitted *pro hac vice*)
Stephen G. Grygiel (admitted *pro hac vice*)
SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
201 North Charles Street, Suite 2600
Baltimore, MD 21201
(410) 385-2225
skelly@mdattorney.com
ssilverman@mdattorney.com
sgrygiel@mdattorney.com
*Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I certify that, on August 25, 2016, I served the foregoing via the Court's ECF electronic transmission in accordance with the Court's Administrative Procedures for ECF to the registered participants identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, if any.

/s/ Charles G. Douglas, III_____
Charles G. Douglas, III (NH Bar. No.669)