# EXHIBIT A

# Dangerous

There are two very different accounts of what happened the evening of May 30, 2014, at St. Paul's School, between star scholar-athlete Owen Labrie, 18, and a 15-year-old freshman girl. And, in the wake of a high-profile rape trial, two lives have been irreparably damaged, while the culture of one of America's most illustrious prep schools is in the dock. An alumnus, TODD S. PURDUM, investigates



PETER PINGER

# Privilege

**IF WALLS COULD TALK**
The Schoolhouse building, at the heart of the 2,000-acre campus of St. Paul's School, in Concord, New Hampshire.

*Grant, O Lord,*
*That in all the joys of life we may never forget to be kind.*
*Help us to be unselfish in friendship,*
*Thoughtful of those less happy than ourselves,*
*And eager to bear the burdens of others*
*Through Jesus Christ our Savior.*
*Amen.*
—St. Paul's School Prayer.

## I. One Night in May



e was 18, a scholarship boy from a bitterly broken home, a star scholar-athlete—captain of the varsity soccer team—who had won full-ride admission to Harvard, Princeton, Yale, Dartmouth, Brown, Duke, Stanford, Middlebury, and the University of Virginia, and two days later would be the winner of the headmaster's award for "selfless devotion to School activities."

She was 15, a privileged second-generation preppy who had been raised in Asia and whose older sister had briefly dated the boy and advised her to steer clear of him; by all accounts a naïve and impressionable freshman both flattered and flummoxed by the insistent e-mail entreaties of one of the most popular boys at St. Paul's School, in Concord, New Hampshire.

On the evening of Friday, May 30, 2014, Owen Labrie, carrying a backpack, a blanket, and a key that he himself acknowledged was stolen, took the girl to a dark attic mechanical room, in the $50 million math-and-science building named for the old New York family that produced Mayor John V. Lindsay, for an encounter that turned sexual.

This is the beginning—and virtually the end—of agreement about what happened between two young people that night. Like a Rashomon episode of Showtime's *The Affair,* almost everything else depends on the protagonists' divergent perspectives, dueling recollections, and diametrically opposed interpretations of intent.

He says her underwear never came off. She says she held her underwear up tightly with both hands but that he moved the front aside. He says they never had sex. She says he raped her, with both of his hands visible above her waist. He says she giggled and seemed to enjoy their kissing, caressing, and rolling around—an assessment she does not dispute. She says she said "no" three times. He says he got up to retrieve a condom from his shorts and suddenly realized that "it wouldn't have been a good move to—it wouldn't have been a good move to have sex with this girl." DNA from his skin cells was found in the inside panel of her underwear, as was semen that could not be definitively linked to him.



In the aftermath of their encounter, they exchanged tender e-mails referring to each other as angels—and anxious Facebook messages about her lost earring, and whether he'd used a condom. When the girl's older sister learned of the encounter, she smacked the boy in the face, giving him a shiner for his graduation that Sunday. In the small hours of the following Tuesday morning, the girl finally telephoned her mother. The school then reported the case to the local authorities as required by law. The resulting whirlwind has consumed the rarefied world of St. Paul's, made front-page news across the country, inspired an episode of *Law & Order: Special Victims Unit,* and sparked fresh debate about the meaning of sexual consent and about teenage hook-up culture in the age of social media.

At his trial, last summer, the prosecution alleged, and the avail-

PHOTOGRAPHS BY JONATHAN BECKER (DINING HALL, DORMITORY), JIM COLE/A.P. IMAGES (LABRIE), PETER FINGER (CHAPEL, POND)



**SACRED GROUNDS**
*Clockwise from top left:* students make their way to Coit Dormitory, named for the first rector at St. Paul's; the Library Pond; the Coit Upper Dining Hall; the Chapel of St. Peter and St. Paul; Owen Labrie, charged with felony sexual assault, during his trial, in Concord, August 2015.



AWAITING APPEAL
Labrie with his father in Vershire, Vermont, November 2015. *Opposite,* in his bedroom at his mother's house, in nearby Tunbridge, the same month.

able evidence strongly suggests, that Labrie seduced the girl as part of an organized ritual—a competition with other boys to see who could "slay" the greatest number of younger girls in the weeks leading to graduation.

In August, a jury acquitted Labrie on the charge of forcible felony rape but convicted him on three misdemeanor counts of statutory rape—penetration of his under-age victim with his hands, tongue, and penis—and on a felony charge of using a computer to lure a minor for sex, an offense that requires him to register as a sex offender for life. In October, he was sentenced to a year in jail, five years of probation, and lifetime registry. He remains free while he appeals the convictions, with a legal team led by the former president of the New Hampshire Bar Association and with a likely assist from Alan Dershowitz, who is himself in the midst of vigorously disputing allegations that he had sex with an under-age girl. In the meantime, the victim's family has said it may sue St. Paul's in an effort to force changes in discipline and governance and ensure greater supervision of the 541 students who now have wide run of the bucolic 2,000-acre campus.

## II. "Statch"



Disclosure: I am an alumnus of St. Paul's, from the class, or "form," of 1978. The school transformed the life of the small-town midwestern boy I was. At my graduation, I won the same prize that Labrie won at his—the Rector's Award, given by the headmaster to one who has "enhanced our lives and improved the community." Four years ago, when Labrie was a student, I was a visiting lecturer. Over the years, I have been active as a representative of my class and as a member of the alumni magazine's advisory board, and have edited a book of writings by a former rector, as St. Paul's headmasters are known. My classmates include parents of current and recent students, some of whom knew Labrie well.

Before receiving this assignment, I had corresponded with the rector, Michael Hirschfeld—himself from the St. Paul's form of 1985—expressing misgivings about the school's public statements and its handling of the case. When I began my reporting, Hirschfeld expressed a willingness to talk, but he and the school's lawyer and the president of the board of trustees repeatedly deferred or delayed requests for interviews before finally issuing a formal statement and answering some written questions. The account that follows is based on that information and on interviews with faculty, staff, parents, alumni, and students (all of whom consider themselves friends of the school); with a senior law-enforcement official involved in the case; with representatives of the families of Owen Labrie and the victim (whose identity *Vanity Fair* is shielding in conformity with standard practice in cases of sexual crimes involving under-age persons); and with the father of the victim. I have also spoken with Owen Labrie and his father. What I've learned has made me as sorry as if I were covering a crisis in my own family—which, in a sense, I am.

In public statements, St. Paul's and many of its students, alumni, and friends have insisted that what happened in this case was not representative of the broader culture of an institution that, since its founding, in 1856, has educated the cream of the American aristocracy. Its distinguished alumni include the novelists Owen Wister and Rick Moody; the diplomats John Gilbert Winant and John F. Kerry; Senator Sheldon Whitehouse; the actors Judd Nelson (my classmate) and Catherine Oxenberg; plus Garry Trudeau and a passel of Pillsburys, Chubbs, Reids, Rutherfurds, and Wilmerdings, along with the worthy heirs of clergymen, diplomats, teachers, and other promising scholarship kids like Labrie.

The school's lush grounds—a wonderland in winter; a lilac-scented Arden in the spring—are the envy of many a small college. All students and faculty are required to live "on grounds." The master plan for its interlocking network of ponds, waterfalls, and pathways was laid out by the firm of Frederick Law Olmsted, the designer of New York's Central Park. Watergate special prosecutor Archibald Cox, class of 1930, took a head-clearing walk around the Lower School Pond during the crisis over his subpoena of Richard Nixon's White House tapes.

Defenders of St. Paul's point to its curriculum on "Living in Community." In line with its tenets, students are taught "self-awareness, self-management, social awareness, relationship building and positive decision-making." As a prefect, or dorm leader, Labrie had received explicit training in the definition of statutory rape—"statch," as students call it—and responsible sexual conduct, and signed a statement affirming his special obligation to follow the rules. The school prayer beseeches God to "grant that in all the joys of life, we may never forget to be kind." The school's secular credo—coined by Hirschfeld when he was director of admissions—is "Freedom with Responsibility," a concept now under debate.

Yet it is hard to avoid the conclusion that something has gone badly awry at the school. About every 10 years since the mid-1990s, St. Paul's has been consumed by scandal: one rector resigned after a no-confidence vote by the faculty; a second was forced to resign after a state investigation into his compensation; and now there is the Labrie affair. The common thread? A rotating cadre of circle-the-wagons trustees and administrators who would defend the school's reputation in the face of damning facts and obvious misconduct.

While evidence suggests that the term "senior salute"—in which 12th-grade students of either gender in their last months at school reached out to younger students of the opposite sex—had not existed for more than two or three years, the practice of "scoring," or "secret scoring," in which students kept track of their romantic

PHOTOGRAPHS BY COREY HENDRICKSON/GETTY IMAGES ASSIGNMENT






or sexual conquests, had existed for much longer, as had the ritual of upper-class boys' "ranking" younger girls' attractiveness as the boys sat in a common room outside the main dining hall after meals. In a 2013 essay in the school newspaper, *The Pelican,* Labrie himself had written about the practice. "Is secret scoring in dirty Schoolhouse closets the key to happiness?" he asked. "Anyone who has a sweet relationship can tell you it is not." In a speech to the student body last spring, Hirschfeld recalled having heard both male and female students use the words "slay" and "slayer" in references to sexual relationships. "These words made me uncomfortable, as I suspect they did many other people," the rector said. "While these words made me uneasy, I did nothing as the head of the School to address their use nor, to my knowledge, did anyone else. Why was that? Are these words and what they suggest a part of our air? We should be asking these questions." Hirschfeld's remarks have since been removed from the school Web site.

Faculty, alumni, and parents with whom I have talked reported that the ritual of "senior salute" could involve everything from holding hands to a walk to the school boat docks to sexual intercourse, while the definition of "scoring" was said to be similarly vague. But there is no disputing that school officials were aware of a "scoring wall" behind a washing machine in an upper-class dormitory, where an interlocking diagram of hookups had been logged for years. The school kept painting over it, only to have the list repeatedly reappear. The rise of social media has exacerbated the situation and driven such behavior underground to adult-free cyberspace.

According to one former longtime faculty member, Hirschfeld himself first heard the term "senior salute" in the spring of 2013—a full year before the Labrie case—when a student in Labrie's dormitory accidentally left his computer logged on and a dormmate punked him by sending a message to the rector's wife, Liesbeth, asking "Senior salute?" But the school year was ending and no one seems to have run the meaning of the term to ground, or ascertained the prevalence of the practice.

"I don't understand the culture of some of the adults there," another longtime former faculty member told me. "Somebody should have said, 'Senior salute? Not in our school.'"

In the spring of 2014, one faculty member, a housemaster in a girls' dorm, complained in an e-mail to senior administrators about senior boys trolling for under-age girls. The teacher involved declined to comment, citing school policy, but others with knowledge of the situation told me that the boys were given a talking-to by their faculty advisers and made to apologize to the housemaster but were not otherwise disciplined. (Labrie was not one of the boys.)

What is perhaps most depressing from the trial testimony, and documents submitted by the prosecution at the time of Labrie's sentencing, is that the rite in which Labrie participated was not the province of disaffected or marginalized students who were known rule breakers. Instead it involved some acknowledged leaders of the school: the captain of the soccer team; editors of the newspaper; a class officer of the grade behind Labrie. They shared stolen keys not just to the science-building mechanical room but to other private spaces on the grounds. They shared e-mail templates for inviting girls to a salute and passed around a papier-mâché "slay" mask that amounted to a kind of trophy. This all apparently came as a shock to faculty and administrators—including Hirschfeld, a onetime scholarship kid and athlete, who is said to have seen in Labrie something of himself, the very model of a St. Paul's student, the kind of person that the school's diploma would have called in my day a "*juvenis optimae spei,*" a youth of brightest hope.

### III. Bucket List

Owen Labrie (pronounced Luh-*bree*) lives in rural Vermont, in the town of Tunbridge. His parents are Cannon Labrie and Denise Holland. They divorced when Owen was two—in a bitter custody and child-support battle that, court records show, included his mother's accusing his father of sexually abusing the boy, an accusation that Cannon Labrie denied and Vermont authorities could not substantiate.

Cannon Labrie is a graduate of Andover with a Ph.D. from Brown, a onetime college instructor, an editor at Chelsea Green Publishing, and a sometime amateur musician. He now works mostly as a landscaper. Denise Holland is a public-school teacher CONTINUED ON PAGE 229




CONTINUED FROM PAGE 207 in Vermont. In a letter submitted to the trial judge at the time of Owen's sentencing, she claims to have raised Owen mostly as a single parent, often with child-support payments in arrears—a contention that Cannon Labrie disputes.

In that letter, Denise Holland said that she runs a rescue shelter for Labrador retrievers in her home and that Owen sometimes falls asleep on the floor comforting the dogs. She described Owen's construction of a small wooden chapel on his father's property last year as a "service project." On her advice, after being questioned by police, Owen deleted some 119 Facebook messages relating to the senior salute and his interaction with girls at school. The prosecution was able to recover these messages but could not ascertain the date of their deletion, and is thus undecided about whether to file a destruction-of-evidence charge against Labrie.

Labrie was recruited by St. Paul's as a 10th-grader to play soccer, and a condition of his full-scholarship admission was that he repeat the grade. While St. Paul's has long prided itself on not accepting so-called postgraduate students—at other, less posh prep schools, typically fifth-year high-school jocks brought in to round out varsity teams—it has in recent years increasingly accepted promising athletes in 9th, 10th, and even 11th grade, and then made them repeat a year, as Labrie did, so that some seniors wind up being a year older than the normal age of their classmates. The result is that 18- and 19-year-olds are on the same campus with students as young as 14.

Hardly alone among teenagers, Labrie presented a radically different persona to adults than he did to his fellow students. A father of a recent graduate, who questioned his son about the prosecution's evidence that Labrie had kept a list of girls he wanted to "slay," told me that his son had reported, "Dad, if this guy was going to do it, he was the type that would make a list." By all accounts, Labrie was super-competitive, always eager to prove his worth among the group of mostly wealthy, well-connected kids who were his best friends.

Social-media and yearbook photos of Labrie often show a handsome, suntanned, windblown frat-boy-in-training—a marked contrast to the horn-rimmed Harry Potter persona he presented at trial. Labrie's documented statements about women and sex have a dark undertone. In a poem he published in the school literary magazine in the fall of 2013, Labrie wrote of a "lonely gynecologist" sitting in a greasy-spoon diner in Michigan, "mulling over the undeniably miserable and miserably undeniable fact that his vast knowledge of the vagina had never, not even once, been of practical use."

Some of the most damning evidence against Labrie was not introduced at trial. New Hampshire state-superior-court judge Larry Smukler ruled that nothing prejudicial to the defendant could be admitted. But in its sentencing memo after Labrie's conviction, the prosecution cited various electronic communications revealing Labrie's unvarnished views. After one girl had rejected his advances, for example, Labrie variously wrote: "she turned me down . . . fucking hate forbidden fruit . . . fuckin girls so much." He quotes from a comedian's routine: "another dumb cum-bucket struck from my nut sucking, suck it slut, slut fucking bucket list." Writing to friends, Labrie said his style with women was to "feign intimacy . . . then stab them in the back. throw em in the dumpster. . . . I lie in bed with them . . . and pretend like I'm in love."

### IV. Shunned

Labrie's victim is the middle daughter of a 1980s-era graduate of St. Paul's. He attended the school with the help of scholarship aid and went on to a successful career in international finance, based for many years in Tokyo, where the victim attended Catholic elementary school. Her older sister enrolled at St. Paul's in Labrie's class in the fall of 2011, and the victim herself joined her at St. Paul's in the fall of 2013.

By all accounts, the sisters are extremely close, with the younger all but idolizing the older. But the father of one of the victim's contemporaries at St. Paul's told me that the younger girl also struggled at times "with her identity in competition with her sister." The victim testified at trial that she took daily medication for anxiety and depression, and the evidence shows that from the outset she was ambivalent—alternately curious and wary—about a potential encounter with Labrie, whom she had known only casually through her sister, who had broken off a brief relationship with him.

The victim initially rejected Labrie's flirtatious invitation to climb "hidden steps" to a door whose hinges had suddenly "swung open in my hands." But after the intercession of a fellow ninth-grader—a dorm-mate of Labrie's, now a varsity hockey player, still at the school—she relented. "He's the big man on campus, and he asked her," the contemporary's father said. "'Nuff said? That's not enough. There's a complex set of human things going on." The girl was particularly intent that the encounter remain a secret, though she would later tell Labrie that he could count it toward "the numbers" of the senior salute. Just what the victim expected of the rendezvous is unclear. She acknowledged at trial that she had shaved her pubic hair in advance, and her closest friend told the police that the girl had said she was probably willing to let Labrie finger her vagina, and to fellate him, though she herself testified that she did not recall saying this.

What she got was something else: a physical encounter that, she testified, quickly escalated beyond her comfort. She acknowledged being excited as she and Labrie kissed in the dark against a wall, then sank to the floor. She lifted her hips to help him slip off her shorts. But when he tried to remove her bra and underwear, she testified, she stopped him and said "no" three times. She said he bit her breasts through the bra, hard enough to hurt her. And

when she felt something inside her that she knew could not be his hands—since she could see them above her waist—she froze.

Labrie told the police that in a moment of "divine inspiration" he had stopped short of intercourse. At the trial—after he knew that his DNA had been found in the victim's underwear—he was more specific, recounting for the first time how he might have prematurely ejaculated during "dry humping" in a way that left semen on his boxer shorts or her underwear. As he finally moved to put on a condom, he said, he had begun to lose his erection, was embarrassed, and brought the encounter to an awkward end. The pair left the Lindsay building separately. The first person the victim saw was a classmate, who happened to be the son of the rector. "I think," she told him, "I just had sex with Owen Labrie."

When Labrie returned to his dorm, he told dorm-mates, who proffered high-fives—and friends with whom he later exchanged electronic messages—that he had, in fact, had sex with the girl. At trial, he insisted he had done so only to avoid confessing the fumbling details of a make-out session gone sour.

The victim testified that she returned to her own dorm in a state of confusion, offering the same half-giddy, half-stunned confession—"I think I just had sex with Owen Labrie"—to her friends. When Labrie soon e-mailed her, "You're an angel," she replied—with the help of her friends—"You're quite an angel yourself, but would you mind keeping the sequence of events to yourself for now?" As the night wore on, the exchange of electronic messages continued, punctuated on the victim's end by repeated "ha-ha-ha"s and light badinage.

Labrie's lawyer offered these messages as proof that the victim had not just undergone a traumatic experience—and perhaps had not even had sex at all—while the prosecution explained them as the reverse: a textbook example of a date-rape victim's efforts to placate and pacify her assailant. Her sister's graduation was looming, her parents were in town, and the last thing she wanted, she testified, was to make any trouble or have the word get out. By Sunday morning, again at the urging of her friends, she was worried enough about a possible pregnancy that she went to the infirmary and asked for a "Plan B" contraception pill, but told the nurse on duty that she'd had consensual sex. Late Monday night, when a dorm master found her in tears, the teacher told her to call her mother, who drove to school the next morning.

It is, of course, impossible to reconstruct the girl's precise state of mind in the aftermath of these events, but her family and law-enforcement officials say that the more she thought about the encounter the surer she became that she had been the victim of a crime. This, too, is far from unusual for victims of acquaintance rape. "I don't think she saw this coming," one law-enforcement official involved in the case told me. "She did say no. She held on to her underpants with both hands. She didn't know how hard to press. Compliance began to look like consent." As Judge Smukler noted at Labrie's sentencing hearing, compliance and consent are not the same thing. Because the jury acquitted Labrie of forcible rape, Smukler said, "does not mean the victim consented to the sexual penetration, and indeed it is clear from the impact of this crime that she did not."

In the fall 2014, the victim returned to school, after assurances from Hirschfeld that she would be safe. She re-entered the same dorm, with the same group of friends, most of whom now shunned her, according to her family. They say some of her volleyball teammates declined to eat with her the first night back and that members of the men's hockey team stood up and pointed at her as she walked down the street. Finally, that December, she gave up and asked to go home. She is now in a private day school in the distant state where the family lives.

But the reverberations continue. At one point in the trial, the girl's name was inadvertently broadcast, subjecting her and her family to Internet harassment and a smear campaign of the most vicious sort. In all these months, the victim's father told me, the family has not received a single supportive phone call from another St. Paul's parent.

The girl's family is wealthy. Money is not the principal object of its potential lawsuit against the school, which has brought on Michael Delaney, a former New Hampshire attorney general, as its lawyer. The family has hired Steven Kelly, of Baltimore, a nationally known lawyer in sexual-assault and -abuse cases, to use the leverage of a suit to force the school to adopt changes in training and discipline for students and faculty. "This is going to be a soapbox issue for the rest of my life," the father says.

### V. Another Shoe

Owen Labrie's life is also in shambles. His offer of admission to Harvard—and his full scholarship—was withdrawn in the wake of his arrest. He hired and fired three lawyers and, whether out of ignorance or arrogance or wishful thinking, rejected more than one proposed plea bargain that would have involved minimal jail time and no registration as a sex offender. He finally settled on J. W. Carney, a prominent Boston defense lawyer who has also represented the mobster Whitey Bulger, retaining his services with $100,000 raised from several St. Paul's families. Labrie had solicited the defense fund in a letter that the prosecution contended violated the terms of his pre-trial release, which barred him from contacting the victim or her family or anyone associated with St. Paul's, but since he was in the process of firing his lawyer at the time, prosecutors conceded he might not have been aware of the conditions.

There has been much hand-wringing about whether Labrie's felony conviction for using a computer to lure a minor was warranted, since the impetus for the law under which he was charged was to stop adults from preying on under-age victims, not to police teenage behavior. Much less noticed is the fact that the trial judge's split-the-difference sentence of a year in jail was more lenient than the penalty recommended by the pre-sentencing investigation requested by Labrie's own defense counsel. This evaluation, conducted by a probation officer, concluded that Labrie had not been truthful about several matters—a contention Labrie's lawyers dispute. The report recommended that Labrie undergo a rigorous course of sex-offender treatment while confined to state prison—not jail—and should not be eligible for parole until he had completed that program. Judge Smukler did not adopt that recommendation but instead ordered a new "psycho-sexual evaluation" of Labrie to determine the appropriate course, and that evaluation—and any potential treatment—is on hold pending Labrie's appeal.

A senior law-enforcement official involved in the case told me that if at any point in the long investigation Labrie had acknowledged wrongdoing and expressed regret, the case could probably have been resolved without even a conviction, by sending Labrie to a sex-offender diversion program. Instead, Labrie has chosen to go for broke, filing a kitchen-sink notice of appeal, preserving his options for contesting the guilty verdicts on multiple grounds. His appeals lawyer, Jaye Rancourt, has said the ultimate goal is to overturn the felony conviction or get a new trial on all the charges, in which he might yet be acquitted. At this point, Dershowitz's involvement is more theoretical than practical, but Rancourt told me that Dershowitz has, in fact, offered his services in drafting the appeal. Labrie is now back in Vermont with his mother and spending time with his father, who lives about 10 miles away. He has given one on-the-record interview, to *Newsweek,* which portrayed him sympathetically as a young man whose ambitions to join the ministry have been derailed by a youthful indiscretion and a murkiness in the law. The article left the victim's family angry and distraught, they say.

The one sentiment that unites the families of Labrie and the victim is outrage at St. Paul's. Labrie's camp complains that the school named and shamed him in public letters to parents and alumni, revoked his Rector's Award, and banned him from campus even before the trial, much less the verdict. The victim's family says the school betrayed its promises to guarantee her safe and successful return to campus, and allowed a student culture to flourish in which teachers and administrators—cowed by rich and powerful parents—allowed the inmates to run the asylum.

For its part, the school has been hamstrung by legal constraints and fears of the victim's lawsuit. Its statements about the case have been so heavily lawyered as to lack proper nouns, action verbs, even palpable sadness.

In his statement to *V.F.*, Hirschfeld acknowledged that "the last 19 months have been heartbreaking for the School community, no more so than for the survivor and her family," and outlined various initiatives that St. Paul's has undertaken, including a comprehensive review of the school's safety and reporting procedures; the creation of the new post of vice-rector for school life to oversee the health center and chaplaincy; the clarification of school rules to make "participation in games or competitions of a sexual nature" grounds for expulsion; enhanced training in anti-bullying techniques; and creation of a "bystander intervention program" in which students are taught not to remain passive in the face of misbehavior by their peers.

As for Labrie himself, Hirschfeld says, he was "profoundly disappointed to learn of his participation in such contemptible behaviors," and like others "felt betrayed by the duality of his life here and disheartened by his continued failure to own any part of his behavior."

Meantime, some prominent alumni and parents have rallied around the school, or around Labrie, or both. A group of recent graduates wrote a letter to *The Boston Globe* last September, insisting that the case was not representative of student life at St. Paul's. Their message was somewhat undercut by the fact that one of the signers, now a freshman at Princeton, is identified in court documents as having received stolen keys from Labrie. (He declined a request for comment from *V.F.*)

At a weekend symposium for alumni volunteers last fall, attendees told me, a student panel explained that, in recent years, traditional dating relationships had become the exception at St. Paul's. Short-term sexual encounters were the norm. The students said this seems to be changing in the aftermath of the Labrie case. Hypersexualized behavior among teenagers is not unique to St. Paul's. But the Labrie case shows that there may be aspects of life in the privileged—and highly independent—atmosphere of an elite boarding school that allowed an Owen Labrie to flourish undetected. Parents paying $54,290 a year in tuition to get their children into top colleges don't like hearing news of misbehavior by their kids—and so misbehavior is sometimes overlooked. And students, frantic to get into the best colleges themselves, can't stand the prospect of making the kinds of mistakes they might actually learn from.

There is at least one more very heavy shoe to drop. Last fall, the authorities in New Hampshire charged Donald Levesque, a former teacher's assistant at a nearby day school, with luring two of his former students—an 18-year-old girl and an under-age boy—in December 2013 for a mutual sexual encounter in his home, and with repeatedly abusing the boy over several months. Public records and local media reports in Concord have identified the girl as a St. Paul's senior at the time; the boy is understood to be the son of a St. Paul's staff member. A date has not yet been set for trial, but a public airing of the sordid details of the case would only bring more scrutiny to the school and raise new questions about Hirschfeld's leadership.

In its most recent accreditation of St. Paul's, in 2007, the New England Association of Schools and Colleges recommended that the school "review the balance between student freedom and institutional responsibility," particularly "with respect to safety and supervision in the evening hours." In 2010, the school responded in a self-evaluation, noting that dorm check-in hours had been moved up half an hour in the fall and winter to 10 P.M.; school buildings were locked at 10 P.M.; faculty were encouraged to walk around the dorms after hours; theater practices were moved from evening hours to afternoons. It would not be unreasonable to imagine that much more could be done.

All of this makes me sad. Forty years ago, when I arrived at the school, co-education was still a novelty. St. Paul's certainly had its problems. There was serious drug and alcohol abuse by students (and, in the case of alcohol, by some teachers), and these issues were dealt with inconsistently. There were sexual predators among the faculty, and they were allowed to skate by. But there were no locks on doors, and there was a pervasive attitude of mutual trust. Every other Saturday night, my friends and I were quietly allowed to stay in the school newspaper's basement offices until one or two A.M. in order to work on it, creeping back to our dorm through the dew unafraid. Now key cards are required at all hours to gain entry even to classroom buildings, and a peaceable kingdom seems an impossible dream.

"Freedom with responsibility?" a recently retired faculty member said of Mike Hirschfeld's motto. "Completely asinine, and not in tune with any teenager's reality. Freedom with responsibility? How about accountability?" In its school prayer, St. Paul's asks divine help to "bear the burdens of others." Its own burdens are the ones that need attention now. □