**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **ALEXANDER AND SUSAN PROUT,** | * | |
| c/o Charles G. Douglas, III | | |
| Douglas, Leonard & Garvey, P.C. | * | |
| 14 South Street, Suite 5 | | |
| Concord, NH 03301 | * | |
| as parents, next friends and legal guardians | | Case No. 1:16-cv-00225-PB |
| of F.P., a minor, | * | |
| | | |
| *Plaintiffs*, | * | **JURY TRIAL DEMANDED** |
| | | |
| v. | * | |
| | | |
| **ST. PAUL'S SCHOOL,** | * | |
| 325 Pleasant Street | | |
| Concord, NH 03301, | * | |
| | | |
| *Defendant*. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Alexander and Susan Prout, as parents, next friends, and legal guardians of their minor daughter F.P., by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), hereby file this First Amended Complaint and Demand for Jury Trial against Defendant St. Paul's School ("SPS"). Plaintiffs sue SPS under the New Hampshire causes of action asserted below, seeking remedy for a sexual assault F.P. suffered as a direct result of SPS' fostering, permitting and condoning a tradition of ritualized statutory rape (referred to as the "Senior Salute") among its students and SPS' utter failure to meet its most basic obligations to protect the children entrusted to its care.

1

## NATURE OF THE ACTION

1.     This action arises out of the entirely preventable sexual assault of a 15-year-old minor freshman girl by a graduating adult male classmate at SPS, an elite New Hampshire boarding school.

2.     On May 30, 2014, Owen Labrie, using keys passed down to him from his brethren in a secret club known as the "Slaymakers," led F.P. into a secluded, dark machine-room and sexually assaulted her.  Labrie regarded this assault as nothing more than another "score" in the "Senior Salute," a campus-wide competition that encouraged senior men to commit statutory rape and otherwise harass and treat SPS' underage female students as targets of sexual desire.

3.     Owen Labrie was far from a lone bad apple who failed to accustom himself to SPS culture and abide by school norms. Rather, Labrie embodied the warped culture of sexual misconduct and deviant moral norms at SPS.  Labrie was a scholar-athlete and captain of the mens' varsity soccer team who was, during SPS' commencement ceremony in May 2014, presented with an award recognizing his "selfless devotion to school activities." Labrie's fellow Slaymakers included acknowledged leaders of the school — editors of the newspaper, class officers, and prefects — who were entrusted with special advisory duties relating to younger students.

4.     Alexander and Susan Prout, and indeed the state of New Hampshire, entrusted SPS, as a residential boarding school, with the same rights and responsibilities of a ***parent*** of F.P. and each child who lived and studied there. Alexander and Susan Prout reasonably relied on SPS to undertake and faithfully discharge those parental rights and responsibilities. But SPS failed to meet even its most basic duties to F.P. and the other students at the school, a failure resulting in ruinous harm for F.P. and her family.

2

## PARTIES, JURISDICTION AND VENUE

5.      Alexander Prout is an individual who is a citizen of the states of Florida and New York.

6.      Susan Prout is an individual who is a citizen of the state of Florida.

7.      F.P. is a minor who resides in the state of Florida.

8.      SPS is a non-profit corporation organized and existing under the laws of New Hampshire and maintaining its principal place of business at 325 Pleasant Street, Concord, NH 03301.

9.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction of Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in, and conducts business within, this judicial district.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

12.     F.P. enrolled at SPS in September 2013 when she was 14 years old.

13.     SPS is an elite Episcopal boarding school set amid 2,000 acres of woodland and meadow in Concord, New Hampshire. The school was founded in 1856 and its graduates include notables in business, politics, the arts, and academia.

14.     According to its website, the estimated annual cost of attendance at SPS is $57,985.

15.     Alexander Prout was a scholarship student at SPS who went on to a career in business with a specialty in Asian markets. He spent most of his career in Japan, and his three daughters, including F.P., largely grew up in the close-knit, expatriate community in Tokyo. F.P. went to a small Catholic school with a strong network of friends, teachers and parents.

16.     In March 2011, the family (like everyone in Japan) was rocked by the devastating Tōhoku earthquake and tsunami, which forced them to quickly relocate back to the United States.

17.     F.P.'s older sister enrolled at SPS in September 2011.

18.     In relocating to the U.S., F.P. missed her strong social connections and established support network in Japan.

19.     F.P.'s family believed SPS, as a residential boarding school, with live-in faculty members was a good choice for her high school education.  They believed the school would offer F.P. the kind of supportive environment she had in Japan and would thus allow her to continue to grow socially and academically.

20.     F.P. applied for admission to SPS and was accepted to enter in the fall 2014 term.

*SENIOR SALUTE*

21.     Neither F.P. nor her parents were aware of how far SPS had strayed from its Episcopal religious foundations and moral compass.

22.     From the moment freshman girls arrive at the school, they are judged and rated according to appearance.

23.     Senior men entrusted as dorm "prefects" and with other honorific titles view the incoming girls as "fresh meat."

24.     SPS provided students with the school directory for the upcoming year at the beginning of the school year. The directories contain photographs of the students, including incoming freshmen. Senior men created a tradition of getting together in groups to rate the incoming underage girls in their directories to determine "targets" for "scoring."

25.     The men also rated and otherwise harassed the underage girls as the girls entered the school dining hall three times per day. Senior men did this by sitting on couches in the common area that opens into the dining hall, called "senior couches" that are customarily reserved for seniors. The girls had no choice but to walk past the couches, and undergo ogling and catcalls, to get to the dining hall.

26.     These rankings take on special significance in the games of sexual conquest in which male students openly competed with one another to "score" or "slay" — meaning to have sexual relations with (generally younger) female students — in a given time period.

27.     As part of these games, male students ranked the female students according to attractiveness and actively pursued the young women in the top ranks.

28.     The concept of "scoring" — older men's tracking their sexual conquests of younger girls — has long been part of SPS' ethos.

29.     In or about 2012, an SPS student created a website "scoreboard" to track the sexual conquests of SPS students.  Upon information and belief, the student rumored to host the website was subjected to no discipline and SPS did no further investigation into the widespread practice of older students "scoring" with freshman girls, and did nothing to eliminate it.

30.     This practice was the basis for the Senior Salute, a school tradition dating back at least three years in which graduating senior male students tried, in the spring before commencement, to "score" with as many underclass girls as possible.

31.     The importance of "scoring" was extensively discussed in "The Real Student Handbook: The Little Red Book," an independent study project prepared by an SPS student and for which SPS' rector, Michael G. Hirschfeld (himself an SPS alumnae and parent), served as faculty advisor.

32.     This culture of "scoring" was also openly discussed in various pieces published in *The Pelican*, SPS' student newspaper. In one such piece, an SPS student wrote that sexual conquest is a "right of initiation" and an "accepted and expected" part of life at SPS.

33.     For his part, Owen Labrie, a recognized SPS student "leader," wrote about the culture of "scoring" in a 2013 essay in *The Pelican*, inquiring, "Is secret scoring in dirty Schoolhouse closets the key to happiness?"

34.     In or around 2013, a male SPS student brazenly propositioned Liesbeth Hirschfeld – Rector Michael Hirschfeld's *wife* – to engage in the Senior Salute, erasing any doubt that top SPS administrators were aware of this nefarious tradition. One former longtime SPS faculty member has been quoted as stating, "I don't understand the culture of some of the adults there[.] … Somebody should have said, 'Senior [S]alute? Not in our school.'" Todd S. Purdum, *Dangerous Privilege,* Vanity Fair, March 2016, at 207.

35.     Nevertheless, and as recounted in recent media reports, the Senior Salute tradition of sexual conquest continued through the end of 2013-2014 school year, and neither SPS institutionally nor any individual SPS administrators put a stop to it.

### THE "SLAYMAKERS" AND THE SEASON OF "SLAYPRIL"

36.     SPS either was, or should have been, aware that Labrie and other senior men had escalated the Senior Salute tradition by joining the "Slaymakers," a team of competitors in the Senior Salute founded by Malcolm Salovaara, a 2013 SPS graduate.

37.     Upon information and belief, using SPS email, networks, Internet connections, and other devices, Salovaara, Labrie, and SPS students Patrick McCarthy and Tucker Marchese formalized the Slaymakers group by, among other things, setting up an Internet chat group to facilitate communications about the Slaymakers' sexual exploits.

38.     SPS' Student Handbook indicates: "St. Paul's School reserves the right to monitor and track all behaviors and interactions that take place online or through the use of technology on our property or at our events." The Student Handbook further indicates that students are required to sign a form before the student can use any school technology assenting to SPS' right to monitor and/or access a student's information technology activity.

39.     The competitive goal for the Slaymakers was to "score" points by engaging in sexual contact, including intercourse, with as many freshman girls as possible in the weeks leading up to commencement. The young men who participated in this competition openly bragged about their intent to "bone," "score," or "slay" as many underage girls as possible.

40.     SPS either was, or should have been, aware that Salovaara possessed keys to secluded and secured SPS facilities that the Slaymakers and others used as "hook-up" spots for "scoring."

41.     For instance, according to statements made to police, Labrie and his cohorts placed a sofa in a storage shed on the SPS campus for their "scoring."

42.     SPS students referred to the shed, pictured below, as the "Mars Hotel," and students have reported that the shed floor was "lined with discarded condoms."



43.     As the Slaymakers' founding member, Salovaara "passed down" to Labrie keys to locked and secluded SPS buildings, including the keys to a locked, secluded, rooftop room in the building where the assault took place.

44.     The Slaymakers also created and passed down a *papier-mâché* "slaying mask" as well as templates to be used for Senior Salute invitations.

45.     The Slaymakers openly communicated their plans to "break the slaying records in the spring [of 2014]" and the group separately made reference to the month of "Slaypril."

46.     Labrie and his fellow Slaymakers openly and in the presence of SPS faculty and staff engaged in the ritual of "rubbing" the dining hall engraving of the group's namesake, Robert Barrie Slaymaker, pictured below:



47.     Salovaara celebrated the Slaymakers in the following post to Labrie's public Facebook page:



48.     Indeed, the Slaymakers' participation in Senior Salute was so central to Labrie's identity at the school that his yearbook message indicated simply "Slaymaker '47: Nuff said."

49.     As commencement approached, Labrie and Marchese drafted a "target list" that was communicated on SPS' internal computer networks and included the names of *17* female SPS students with whom the men wished to "score." At least ***seven*** of these female students were under the age of 16 and therefore unable to give legal consent in New Hampshire.

50.     One of the listed underage female student targets was F.P.

51.     The target list formed the basis of a bet between Marchese and Labrie as to which one could "score" the most girls on the list.

52.     Rumors regarding the bet were widely circulated throughout campus in the months leading up to commencement in May 2014.

53.     According to documents subsequently filed by the Merrimack County Attorney's office in a criminal case against him, Labrie described his style of "slaying" as to *"feign intimacy… then stab them in the back…THROW EM IN THE DUMPSTER…  I lie in bed with them… and pretend like I'm in love. "*

54.     In those same documents, Labrie is reported to have stated, in regards to a young woman who refused his invitation, *"she turned me down…fucking hate forbidden fruit…fuckin girls so much… another dumb cum-bucket struck from my nut sucking, suck it slut, slut fucking bucket list…"*

55.     The same documents also indicated that Labrie and his counterparts showed a complete disregard for the legal age of consent, communicating, "junior boarding school… 15…and a half… You could be thrown in jail bro… pretty sure the [expletive] was 12… and the [expletive] bum is great…hahaha… HER PREPUBESCENT BUM… LOVE IT… MCCARTHY AND I ARE GONNA BE BAILIN YOU OUT OF JAIL…"

56.     For his part, Rector Hirschfeld admits having heard the terms "slay" and "slayer" as used by male and female students prior to the assault. However, in a speech to students in the spring of 2015, Hirschfeld stated, "***While these words made me uneasy, I did nothing as the head of the school to address their use nor, to my knowledge, did anyone else***."

*SPS IGNORES SPECIFIC WARNINGS*
*IN SPRING 2014 OF DANGER TO FRESHMAN GIRLS*

57.     In the days leading up to commencement, Hirschfeld and other top SPS officials

received but failed to act upon **specific warnings** regarding senior men targeting underage girls.

58.     For example, email communications from SPS employees during this time period

detailed numerous instances of senior men "seeking out" underage girls in an "inappropriate

manner" in or near the girls' dorms.

59.     Although he indicated that he would address the issue at a meeting of the heads of

house, Hirschfeld also indicated that he was "looking forward to graduation," suggesting that his

true hope was that the problem, for that year anyway, would simply go away on its own when

school closed for the summer.

60.     Hirschfeld's failure to take this threat seriously is particularly disturbing in light

of the New England Association of Schools and Colleges, Inc's Commission on Independent

Schools' (the "Committee") 2007 finding that SPS should "review policies regarding the

supervision of students during the evening hours."

61.     The Committee also noted that SPS should "examine whether or not students are

using their free evening hours productively and getting to bed at a reasonable hour …" and "re-

examine the balance between student freedom and institutional responsibility to ensure that

supervision and safety are not compromised by idealism."

62.     SPS failed to heed any of those recommendations.

63.     Because of this deliberate indifference and SPS' failure to take any meaningful

steps to do anything about the Senior Salute tradition, Labrie and his Slaymaker cohorts were

able, in furtherance of their competition, to arrange private nighttime meetings with SPS female

students to, as Labrie described it in his essay in *The Pelican*, "scor[e] in dirty Schoolhouse closets."

### SPS IGNORES SPECIFIC WARNINGS ABOUT LABRIE

64.     SPS similarly turned a blind eye to Labrie's reputation as a sexual predator. For example, in Spring 2014, a female student reported to a senior administrator that Labrie had been "overly aggressive" in a sexual experience, by, among other things, biting her and pulling her hair.

65.     SPS took *no* significant action to investigate these and other instances of aggressive sexual behavior by Labrie.

66.     Had SPS conducted the careful investigation that was plainly warranted, and taken appropriate action, Labrie's competition with Marchese — and the actions of the Slaymakers in general — could have been easily prevented.

### LABRIE SEXUALLY ASSAULTS F.P. AS PART OF THE SENIOR SALUTE

67.     In his competition with Marchese, Labrie focused particularly on F.P., with whom he was acquainted through her older sister.

68.     From the time F.P. arrived on campus, Labrie showed a strong sexual interest in her.

69.     Prior to the sexual assault, F.P. was sexually naïve and inexperienced.

70.     In January 2014, Salovaara asked Labrie via Facebook, "who do you want to pork more than anyone bro?" Labrie quickly replied with F.P.'s name.

71.     In March 2014, Labrie, in a communication with a subject line referencing "Slaypril and Slay," discussed with Marchese Labrie's intention to engage in "an eight week

exercise in debauchery" during the months of April and May. In listing the female students with whom he wanted to "score," Labrie wrote only one name entirely in capital letters — F.P.'s.

72.     On May 28, 2014, at 12:50 p.m., just four days before commencement, Labrie sent F.P. an email from his school account to her school account, stating:

> while the thought of my name in your inbox makes me blush perhaps more than it should, there's something I want to share with you and my evenings left to do it are growing fewer by the evening. there's a door here that's been locked since before we were born, but in a moment of divine intervention the night before last, its hinges swung open in my hands. if you want a definition of the word bittersweet, think of me spending three years trying to open it yet now only having three nights to remember the view. i want to invite you to come with me, to climb these hidden steps, and to bask in the nicest view millville has ever had to offer. i hope you're all right with heights.
> if you're not otherwise engaged, mull it over. i ask only you let me know soon—these days they're not making time quite like they used to.
> yours,
> owen

73.     Attached to the message was a photograph of a wall, located above an archway on campus that was painted with the message, "Believe in Angels."

74.     Upon information and belief, Labrie had sent virtually the same invitation to other SPS students as part of his participation in the Senior Salute.

75.     F.P. replied at 9:09 p.m., indicating:

> owen,
>
> while the thought of your name in my inbox gives me a sense of dejavu, ([my sister] and I are very close sisters,) and although I would like to climb those hidden steps with you, I have to decline. I would like to climb that, not the list of third formers that have spent quality time with you.

76.     Labrie replied a few hours later, after midnight on May 29, 2014, indicating:

> probably one of the sassier emails i've ever received, my sweet lord, and minus chavez and macintyre, i'm afraid that list is slimmer than you might think. pretty much nonexistent this term, even. but do as you please, mon chere, i'd have taken you either way.

77.    Later that same night, Labrie sent messages to classmate O.M., a mutual friend of his and F.P.'s, asking him to try to get her to reconsider the invitation – "to put in a good word for me," as described in documents subsequently filed by the Merrimack County Attorney's office in a criminal case against Labrie. O.M. was working on a science project with F.P. when he showed her these messages from Labrie. O.M. told F.P. that rumors concerning sexual experiences between Labrie and other female students were untrue and Labrie was a good guy. F.P. considered O.M. to be a trusted friend and she believed his representations.

78.    Based on O.M.'s vouching for Labrie, F.P. agreed to accept Labrie's invitation.

79.    F.P. sent an email to Labrie later that same evening agreeing to meet.

80.    The next day, on May 30, 2014, Labrie used Facebook messaging to communicate with F.P.

81.    He asked her "how is your night looking I have dinner from like 7-9."

82.    She replied "I also have dinner but the rest of my night is pretty clear."

83.    Labrie stated "golden, golden . . . it might be a little crazy for the tower but I can take you somewhere else that is pretty sweet jesus my chat isn't working i'll let you know on the book when i am back."

84.    F.P. responded: "Sounds good."

85.    The two arranged to meet outside the front door of a building on campus at 9:15 p.m.

86.    At 9:02 p.m., Labrie sent Salovaara a message stating, "I'M SLAYIN [F.P.]" Labrie continued to send messages to Salovaara before and after Labrie's assault of F.P. that evening.

14

87.    Labrie showed up at the prearranged meeting spot at 9:15 p.m. Unbeknownst to F.P., he had a blanket and a condom in his backpack.

88.    They met and started walking toward the Lindsay Center for Mathematics and Science Building (the "Lindsay Building"). When Labrie noticed that there was a security car and several parents' vehicles in front of the building, he took F.P. around to the back of the building. The two proceeded through an unlocked door at the Lindsay Building and up five flights of stairs to a locked door, for which Labrie had a key that he had obtained from the Slaymakers. Labrie led F.P. through a dark and noisy machine-room to another locked door, which he also unlocked with a key, allowing access to the roof.

89.    Labrie proceeded to engage in numerous forms of sexual contact with F.P. including kissing, digital penetration, oral sex and unprotected vaginal penetration. F.P. told Labrie "no" on at least three occasions and did not consent to any vaginal contact—and could not have consented as a matter of New Hampshire law—based on her age.

90.    When the assault ended, F.P. was confused and upset.

91.    Labrie looked at F.P.'s cell phone and noticed that the time was close to the time he had to check in at his dorm. Both he and F.P. were required to check into their dorms by a certain time.

92.    Labrie left to return to his dorm, abandoning F.P. in the dark machine-room.

93.    Throughout the assault and thereafter, Labrie treated F.P. as just another tally mark for the Senior Salute — dehumanizing and objectifying her in every way possible.

94.    F.P. emerged from the Lindsay Building stunned and largely in shocked disbelief as to what had happened. When she encountered a fellow student, G.H., she said, "I think I had just had sex with Owen." G.H. later told police that, at this time, J.D. "wasn't herself."

15

95.     F.P. returned to her dorm for her scheduled check-in.

96.     F.P. reported the sexual assault to several students in her dorm and she was afraid and upset about it.

97.     F.P.'s friends and other students in the dorm observed that she was upset and in physical pain. At the insistence of two of her friends, F.P. showed them red marks on her breasts and stomach that had been caused by Labrie.

98.     F.P. told her friends that she was not sure whether Labrie had used a condom. F.P.'s friends immediately expressed concerns about potential pregnancy and sexually transmitted diseases.

99.     F.P. was with her friends when she received a message from Labrie indicating, "you're an angel."

100.    At the encouragement of her friends, F.P. wrote back friendly messages designed to keep the dialog open and obtain information about whether Labrie had used a condom during the assault.

101.    In a series of messages, Labrie asked F.P. if she was on birth control, and he acknowledged to her that he had put a condom on "halfway through."

102.    A couple hours after the assault, Marchese asked Labrie via Facebook messaging how the assault of F.P. had gone from "from no to bone?" Labrie replied that he used "every trick in the book," including cunnilingus.

103.    According to testimony at Labrie's criminal trial, he also told classmates O.M., A.T., and H. K. during this time that he had sex with F.P.

104.    On Saturday, May 31, 2014 F.P. went to SPS' health center, the Clark House. Still upset and confused about what had happened and afraid to disrupt her sister's graduation, F.P.

told the nurse there that the sexual contact was consensual. F.P. asked for Plan B emergency contraception.

105.    The following day was F.P.'s sister's commencement, after which her family left to return home.

106.    Late in the evening on Monday, June 2, 2014, students in F.P.'s dorm overheard her sobbing and called the faculty resident of the dorm, Dr. Theresa Gerardo-Gettens, to speak with F.P. F.P. asked Dr. Gerardo-Gettens words to the effect of "what if somebody had sex with me and I did not want them to and said no?" Dr. Gerardo-Gettens advised F.P. to call her mother and instructed her "how you handle this will inform the rest of your life." Despite clearly suspecting that F.P. was reporting a rape to her, Dr. Gerardo-Gettens failed to inform authorities.

107.    Near midnight, F.P. called her mother, crying hysterically, and reported what had happened to her.

108.    The next morning, on June 3, 2014, her mother traveled back to SPS and took F.P. to the Concord Hospital, where she received a sexual-assault forensic examination, made a brief report to the Concord Police Department, and arranged for a full forensic police interview the following day.

109.    The Concord Police Department took a full statement from F.P. on June 4, 2014.

110.    Concord Police contacted Labrie on June 11, 2014, and questioned him in person on June 12, 2014.

111.    After questioning by the Concord Police, Labrie deleted incriminating conversations with Marchese, along with more than *100* other Facebook conversations. These were later recovered by police.

112.    According to information provided to police, Labrie previously had sexual relations with at least one other underage SPS student, possibly in the same room where he assaulted F.P.

### *SPS PUNISHES F.P. FOR REPORTING THE ASSAULT*

113.    Labrie's arrest was publicized to the student body by SPS administrators and the school community was widely aware that F.P. was the victim.

114.    Fully expecting the SPS community to rally around her as a sexual-assault victim, F.P. returned to SPS in August 2014.

115.    F.P. and her family were shocked at the degree to which F.P. was shunned, ignored, and outright mocked after her return to the school.

116.    Most of F.P.'s former friends, other SPS students, and all but a few supportive faculty members, avoided her.

117.    The school community's attitude toward the assault is best exemplified by an experience F.P. had during a school-wide chapel service that occurred after she came back to SPS. At the service, two boys stood up to speak on an unrelated topic and made a joke about the "age of consent." All eyes turned to F.P. and attendees at the chapel erupted in laughter. No one, including the rector, did anything to address the students' mockery of the assault she suffered.

118.    F.P. was also subject to outright bullying. In one incident, the SPS men's hockey team — the top of the social order at the school — intimidated her as she walked by on one of her first days back to school at the start of the new term, standing in unison, pointing and staring her down.

119.    Though Alexander and Susan Prout constantly communicated these incidents of retaliation to school officials, those officials took no meaningful action to address them.

120.     SPS proved to be such a hostile and unwelcoming environment that F.P. left the school in December 2014 and never returned.

*CRIMINAL PROCEEDINGS AGAINST LABRIE*

121.     On July 16, 2014, Labrie was arrested and charged with: (a) three counts of aggravated felonious sexual assault; (b) three counts of misdemeanor sexual assault; (c) one count of endangering the welfare of a child; (d) one count of the felony of "certain uses of computer services prohibited"; and (e) one count of simple assault.

122.     Labrie was offered numerous plea deals, one of which he preliminarily accepted. However, after the plea hearing was scheduled and F.P. and her family had made arrangements to appear, Labrie fired his counsel and withdrew from the deal. Labrie ultimately fired three local attorneys before, with financing from the SPS community, hiring attorney Jay Carney, who is famed for representing organized-crime leader Whitey Bulger.

123.     In a thinly veiled effort to harass and intimidate F.P. and her family, Carney hired private investigators to travel more than a thousand miles to the family's new home to question friends and neighbors who knew nothing about the case.  Among the people questioned was the young daughter of F.P.'s sister's third-grade teacher.

124.     The criminal trial was conducted in the Superior Court of Merrimack County, New Hampshire, in August 2015. F.P. missed the first two weeks of her junior year of high school to attend.

125.     The trial was covered by virtually every major national media outlet and was described by many as a "media circus."

126.    During the opening statements of the trial, F.P.'s name was inadvertently broadcast on several media sites, leading to extreme invasions of her privacy, as discussed below.

127.    F.P. recounted in her victim impact testimony that she "threw up at least two times" each day before trial because of the stress of the proceedings.

128.    F.P. was subjected to grueling cross-examination by Carney, who, among other things, called her a "liar."

129.    Carney also made repeated references to the Senior Salute and SPS' failure to take any action to prevent this "tragedy."

130.    On August 28, 2015, a jury found Labrie guilty of three counts of misdemeanor sexual assault, one count of the felony of "certain uses of computer services prohibited," and one count of endangering the welfare of a child.

### THE LASTING IMPACT

131.    F.P. and her family have been devastated in virtually every way by SPS' failure to fulfill its duty to protect F.P. from this known risk that she would be sexually harassed and assaulted.

132.    F.P. has suffered, and will continue to suffer for the rest of her life, severe emotional distress stemming from the May 30, 2014, assault.

133.    Because F.P.'s name was broadcast to the world, her sense of privacy has been shattered. Her name and identity have been widely circulated on the Internet. Examples of the depraved online postings about F.P. and her family, redacted versions of which are posted below, include:

    a.  pictures of F.P. with her 8-year-old sister;

b.  family photographs;

c.  detailed pictures of F.P.'s family home along with its street address and value;

d.  her being labeled an "attention whore at St. Paul's School who lied to slime an innocent bro with a fake-rape charge";

e.  a threat indicating, "i [*sic*] know my ivy frat bros are putting a target on her, she is gonna get used and abused"; and

f.  an entry indicating the writer's "hope she gets a bit of desperately needed backdoor action."





Date: September 2nd, 2015 6:50 PM
Author: ,,.,;,,..,,,,;;,..;;,;;,.,;,,;,;,..;,;;;,,

faggot.

i know my ivy frat bros are putting a target on her. she is gonna get used and abused.



⊙ Top    ⊙ Previous    ⊙ Next    ⊙ Reply                         ☆ Favorite

Date: September 3rd, 2015 5:47 PM
Author: ,,.,...,;,..,,,;,;,...;;,,,;,,,;,,.;,;,;;;,.

Hope she gets a bit of desperately needed backdoor action

134.    F.P.'s father had to leave his overseas job to support his family through the criminal trial, resulting in disastrous financial losses for the family.

135.    F.P. and her family are greatly disturbed by the extent to which the school they once loved so dearly has disappointed them in so many ways. Almost equally as shocking as the school's failure to deal with what Labrie described as widespread "debauchery" is SPS'

complete unwillingness to accept any responsibility or to engage in any meaningful reform that would result in real change to protect future children from harm.

<u>**COUNT ONE**</u>
*Breach of Fiduciary Duty*

136.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

137.    F.P. enrolled at SPS as a residential boarding student in the fall 2013, when she was 14 years old.

138.    Defendant had a fiduciary relationship with F.P., a residential student and minor. As a New Hampshire educational institution, SPS owed F.P. a special duty of trust and confidence to ensure her safety and wellbeing.

139.    Defendant, through Hirschfeld and SPS' Board of Trustees, administrators, faculty, or staff, breached their duty owed to F.P. by, among other things:

    a.      Failing to properly protect F.P., a minor, from sexual abuse;

    b.      Improperly protecting F.P., a minor, from sexual abuse;

    c.      Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

    d.      Failing to investigate, correct and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

    e.      Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;

    f.      Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and

use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.      Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

h.      Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

i.      Failing to promptly report F.P.'s sexual assault to the authorities;

j.      Failing to take any action to prevent retaliation against F.P. when she returned to the school;

k.      Failing to conduct an exit interview with F.P. when she left the school; and

l.      Failing to heed numerous warnings regarding after- hours security and lax disciplinary policies.

140.    Defendant, through its Board of Trustees, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Labrie to, and increased the likelihood that he would, sexually assault F.P.

141.    Defendant's conduct was wanton, malicious, or oppressive, in that, Defendant exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

142.    As a direct and proximate cause of Defendant's violation of its fiduciary duty  to her, F.P. experienced, and continues to experience, severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**WHEREFORE**, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as, interest, costs, and other relief as justice requires.

**COUNT TWO**
*Negligence*

143.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

144.    In the fall 2013, F.P. enrolled at SPS and was thereby deprived of the protection of her parents.

145.    Upon F.P.'s enrollment, Defendant assumed custody of her and other students housed on the school's premises.

146.    In so doing, Defendant entered into a relationship with F.P. that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect F.P. from reasonably foreseeable harm.

147.    Defendant, through Hirschfeld and SPS' Board of Trustees, administrators, faculty, or staff, breached its duty owed to F.P. by, among other things:

      a.    Failing to properly protect F.P., a minor, from sexual abuse;

      b.    Improperly protecting F.P., a minor, from sexual abuse;

      c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

25

d.      Failing to investigate, terminate, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

e.      Failing to investigate, prohibit, and/or otherwise address references to "scoring" made in student publications;

f.      Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.      Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

h.      Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

i.      Failing to promptly report F.P.'s sexual assault to the authorities;

j.      Failing to take any action to prevent retaliation against F.P. when she returned to the school;

k.      Failing to conduct an exit interview with F.P. when she left the school; and

l.      Failing to heed numerous warnings regarding after- hours security and lax disciplinary policies.

148.     SPS, through its Board of Trustees, administrators, faculty, or staff, knew or should have known that they had created the opportunity for Labrie to, and increased the likelihood that he would, sexually assault F.P.

149.     Defendant's conduct was wanton, malicious, or oppressive, in that, Defendant exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

150.     As a direct and proximate cause of Defendant's violation of its duty of care to her, F.P. experienced, and continues to experience, severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**WHEREFORE**, Plaintiffs demand judgment against Defendant in an amount in excess of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as, interest, costs, and other relief as justice requires.

### COUNT THREE
*Premises Liability*

151.     Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

152.     While on its premises, F.P. was a business invitee of SPS.

153.     SPS owed F.P. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

154.     SPS, through its Board of Trustees, administrators, faculty, or staff, failed to act with reasonable care to protect F.P. and her fellow female students from foreseeable dangers of which SPS had ample actual notice, including, among other things:

　　　　　a.     Failing to properly protect F.P., a minor, from sexual abuse;

27

b.      Improperly protecting F.P., a minor, from sexual abuse;

c.      Allowing Labrie and other male students to foster an environment of sexual harassment and objectification of SPS' female students;

d.      Allowing the Slaymakers to gain illicit access to SPS' facilities for their sexual exploits, as well as use its email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those sexual exploits;

e.      Allowing Labrie to illicitly gain access to the Lindsay Building machine room, where he sexually assaulted F.P.;

f.      Disregarding warnings regarding insufficient security and overly lax disciplinary policies;

g.      Failing to properly secure keys to remote buildings commonly used by senior men to engage in sexual activity with underage girls; and

h.      Failing to supervise students after hours.

155.    SPS knew or should have known that SPS had created the opportunity for Labrie to, and increased the likelihood that he would, sexually assault F.P.

156.    As a direct and proximate result of SPS' negligence, F.P. experienced, and continues to experience, severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

157.    SPS' conduct was wanton, malicious, or oppressive, in that, the school exhibited reckless indifference to or disregarded the foreseeable risks of harm, it acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

**WHEREFORE**, Plaintiffs demand judgment against SPS for an amount in excess of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as, interest, costs, and other relief as justice requires.

<u>**COUNT FOUR**</u>
*Intentional Infliction of Emotional Distress*

158.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

159.    Defendant intended to cause F.P. emotional distress or acted with reckless disregard to the certainty that they would cause such distress by, among other things:

a.    Failing to properly protect F.P., a minor, from sexual abuse;

b.    Improperly protecting F.P., a minor, from sexual abuse;

c.    Failing to investigate, correct and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.    Failing to investigate, prohibit, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

e.    Failing to investigate, prohibit, and/or otherwise address references to "scoring" made in student publications;

f.    Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.    Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner"

29

in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

      h.     Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

      i.     Failing to promptly report F.P.'s sexual assault to the authorities;

      j.     Failing to take any action to prevent retaliation against F.P. when she returned to the school;

      k.     Failing to conduct an exit interview with F.P. when she left the school; and

      l.     Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies.

160.    Defendant's conduct was extreme and outrageous, and intentionally or recklessly caused F.P. severe emotional distress.

161.    Defendant's conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

162.    Defendant's conduct was wanton, malicious, or oppressive, in that, the school exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

163.    Defendant purposefully intended to cause, or recklessly disregarded the high probability of causing, a disturbance of F.P.'s emotional tranquility that was so severe that harmful physical consequences resulted.

164.    As a direct and proximate result of Defendant's malfeasance and nonfeasance F.P. experienced, and continues to experience, severe emotional distress accompanied by objective physical manifestations or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for an amount in excess of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as, interest, costs, and other relief as justice requires.

### COUNT FIVE
*Negligent Infliction of Emotional Distress*

165.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

166.    Defendant had a duty to F.P. to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

167.    Defendant's negligent conduct included, among other things:

a.    Failing to properly protect F.P., a minor, from sexual abuse;

b.    Improperly protecting F.P., a minor, from sexual abuse;

c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.    Failing to investigate, prohibit, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

e.    Failing to investigate, prohibit, and/or otherwise address references to "scoring" made in student publications;

f.    Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.    Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

h.    Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

i.    Failing to promptly report F.P.'s sexual assault to the authorities;

j.    Failing to take any action to prevent retaliation against F.P. when she returned to the school;

k.    Failing to conduct an exit interview with F.P. when she left the school; and

l.    Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies.

168.   As a direct and proximate result of Defendant's negligence, F.P. was sexually assaulted and harassed.

169.   By these various negligent acts, Defendant unreasonably subjected F.P. to a foreseeable risk of emotional harm.

170.    Defendant's conduct was wanton, malicious, or oppressive, in that, Defendant exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

171.    As a further direct and proximate result of Defendant's malfeasance and nonfeasance, F.P. experienced, and continues to experience, severe emotional distress accompanied by objective physical manifestations or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for an amount in excess of $75,000 in compensatory damages and enhanced compensatory damages to be established at trial, as well as interest, costs, and other relief as justice requires.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Respectfully submitted,

Date:  August 29, 2016

/s/ Charles G. Douglas, III_____

Charles G. Douglas, III (NH Bar. No.669)
DOUGLAS, LEONARD & GARVEY, P.C.
14 South Street, Suite 5
Concord, NH 03301
(603) 224-1988
chuck@nhlawoffice.com

Steven J. Kelly (admitted *pro hac vice*)
Steven D. Silverman (admitted *pro hac vice*)
Stephen G. Grygiel (admitted *pro hac vice*)
Edward P. Parent (admitted *pro hac vice*)
SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
201 North Charles Street, Suite 2600
Baltimore, MD 21201
(410) 385-2225
skelly@mdattorney.com
ssilverman@mdattorney.com
sgrygiel@mdattorney.com
nparent@mdattorney.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, on August 29, 2016, I served the foregoing via the Court's ECF electronic transmission in accordance with the Court's Administrative Procedures for ECF to the registered participants identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, if any.

/s/ Charles G. Douglas, III_____
Charles G. Douglas, III (NH Bar. No.669)