UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ALEXANDER AND SUSAN PROUT, as parents, next friends and legal guardians of F.P., a minor, <br><br> Plaintiffs, <br><br> v. <br><br> ST. PAUL'S SCHOOL, <br><br> Defendant. | Civil Action No. 1:16-CV-00225-PB |

## ANSWER AND AFFIRMATIVE DEFENSES

Defendant St. Paul's School (the "School" or "SPS"), through its attorneys McLane

Middleton, Professional Association, answers Plaintiffs' First Amended Complaint as follows:

### NATURE OF THE ACTION

1.      This action arises out of the entirely preventable sexual assault of a 15-year-old

minor freshman girl by a graduating adult male classmate at SPS, an elite New Hampshire

boarding school.

**ANSWER:**      The School, an Episcopal, co-educational, fully residential high school

located in Concord, New Hampshire made up of approximately 525 students from all over the

world, denies that it could have prevented the alleged sexual assault of F.P., a high-school

freshman at the School at the time of the alleged assault, by Owen Labrie ("Labrie"), who was a

high-school senior at the School the time of the alleged assault.  Further answering, the School

states that only F.P. and Labrie know what happened between them on the evening of May 30,

2014.  At the criminal trial in the matter of *State of New Hampshire v. Owen Labrie*, Merrimack

County Superior Court, Docket No. 2014-CR-617 (the "Labrie Proceeding"), the School

acknowledges that each testified as to different versions of the events that occurred between them on the evening of May 30, 2014. The School further recognizes that the jury in the Labrie Proceeding convicted Labrie of misdemeanor sexual assault, misdemeanor endangering the welfare of a child and felonious use of a computer, but acquitted Labrie of felonious sexual assault. Labrie has appealed his convictions, and the mixed verdict is not preclusive in this proceeding. Therefore, the School lacks knowledge or information sufficient to form a belief as to whether F.P. was sexually assaulted by Labrie.

2.      On May 30, 2014, Owen Labrie, using keys passed down to him from his brethren in a secret club known as the "Slaymakers," led F.P. into a secluded, dark machine-room and sexually assaulted her. Labrie regarded this assault as nothing more than another "score" in the "Senior Salute," a campus-wide competition that encouraged senior men to commit statutory rape and otherwise harass and treat SPS' underage female students as targets of sexual desire.

**ANSWER:**     The School lacks knowledge or information sufficient to form a belief as to the allegations in the first sentence of paragraph 2, as well as to what Labrie "regarded." The School denies the remaining allegations in paragraph 2. Further answering, the School states that the "Senior Salute" is in no way a School-sanctioned or endorsed term or event. The School understands and believes that the phrase describes a wide range of behaviors related to students spending time with other students and means a variety of different things to different people and that there is no uniform or singular definition of a "Senior Salute." The School denies that Labrie's secret use of the term Slaymakers had any connection or correlation to use of the terms scoring or senior salute by students at the School.

3.      Owen Labrie was far from a lone bad apple who failed to accustom himself to SPS culture and abide by school norms. Rather, Labrie embodied the warped culture of sexual

misconduct and deviant moral norms at SPS. Labrie was a scholar-athlete and captain of the

men's varsity soccer team who was, during SPS' commencement ceremony in May 2014,

presented with an award recognizing his "selfless devotion to school activities." Labrie's fellow

Slaymakers included acknowledged leaders of the school — editors of the newspaper, class

officers, and prefects — who were entrusted with special advisory duties relating to younger

students.

**ANSWER:**    The School admits that Labrie failed to, in certain instances, abide by

school norms and suffered consequences for these failures. The School admits that the jury in the

Labrie Proceeding convicted Labrie of violations of criminal laws of the State of New

Hampshire.  Further answering, the School states that, until the School learned of the May 30,

2014 incident between Labrie and F.P., and the subsequent investigation into that incident that

revealed other inappropriate conduct by Labrie, it appeared that Labrie had comported himself as

a student at the School.  The School admits that Labrie was captain of the varsity boys' soccer

team. The School further admits that Labrie was presented with the Rector's Award during the

School's commencement ceremony in June 2014, but states that the award was later revoked

prior to the Labrie Proceeding for Labrie having failed to abide by School rules.  The School

denies the remaining allegations in paragraph 3.

4.    Alexander and Susan Prout, and indeed the state of New Hampshire, entrusted

SPS, as a residential boarding school, with the same rights and responsibilities of a *parent* of F.P.

and each child who lived and studied there. Alexander and Susan Prout reasonably relied on SPS

to undertake and faithfully discharge those parental rights and responsibilities. But SPS failed to

meet even its most basic duties to F.P. and the other students at the school, a failure resulting in

ruinous harm for F.P. and her family.

**ANSWER:** The School denies that the State of New Hampshire or any parent entrusts any private boarding school with the "same rights and responsibilities" as parent, as there are many rights and responsibilities as parent that any school simply cannot assume. The School admits that, in coordination with parents, the School assumes various functions and responsibilities over a student in a boarding school environment when the parent is absent. The School otherwise lacks knowledge or information sufficient to form a belief as to the allegations in the first two sentences of paragraph 4. The School denies the remaining allegations in paragraph 4.

### PARTIES, JURISDICTION AND VENUE

5.      Alexander Prout is an individual who is a citizen of the states of Florida and New York.

**ANSWER:** The School states that the allegations in paragraph 5 are legal conclusions to which no response is required. To the extent a response is required, the School lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 5.

6.      Susan Prout is an individual who is a citizen of the state of Florida.

**ANSWER:** The School states that the allegations in paragraph 6 are legal conclusions to which no response is required. To the extent a response is required, the School lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 6.

7.      F.P. is a minor who resides in the state of Florida.

**ANSWER:** The School admits that F.P. is a minor and lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 7.

8.      SPS is a non-profit corporation organized and existing under the laws of New Hampshire and maintaining its principal place of business at 325 Pleasant Street, Concord, NH 03301.

**ANSWER:**    Admitted.

9.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because no Plaintiff is a citizen of the same state as Defendant and the amount in controversy exceeds $75,000.

**ANSWER:**    The allegations in paragraph 9 are legal conclusions to which no response is required.  Further answering, the School does not deny that the Court has subject matter jurisdiction over this controversy.

10.      This Court has personal jurisdiction of Defendant pursuant to Fed. R. Civ. P. 4(k)(1)(a) because Defendant is domiciled in, and conducts business within, this judicial district.

**ANSWER:**    The allegations in paragraph 10 are legal conclusions to which no response is required.  Further answering, the School does not deny that the Court may exercise personal jurisdiction over it with respect to this controversy.

11.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because all the acts and omissions alleged herein occurred in this judicial district.

**ANSWER:**    The allegations in paragraph 11 are legal conclusions to which no response is required.  Further answering, the School does not deny that venue for this controversy is proper in this Court.

## FACTS COMMON TO ALL COUNTS

12.      F.P. enrolled at SPS in September 2013 when she was 14 years old.

**ANSWER:**    Admitted.

13.     SPS is an elite Episcopal boarding school set amid 2,000 acres of woodland and meadow in Concord, New Hampshire. The school was founded in 1856 and its graduates include notables in business, politics, the arts, and academia.

**ANSWER:**     The School admits that it is a co-educational, fully residential high school founded in 1856 that is located in Concord, New Hampshire on 2,000 wooded acres.  Further answering, the School admits it is an Episcopal school, welcoming of all faiths, made up of approximately 525 students from all over the world.  The School further admits that its alumni include individuals who are accomplished in business, politics, the arts, academia, and other fields.  Further answering, instead of focusing on whether it can be defined as "elite," the School strives to challenge its students intellectually and morally—to nurture a love for learning and a commitment to engage as servant leaders in a complex world.

14.     According to its website, the estimated annual cost of attendance at SPS is $57,985.

**ANSWER:**     The School admits that the estimated cost of attendance for the 2015-16 school year was $57,985.  Further answering, the School states that it is committed to making it an affordable option for families and has awarded $11.4 million in financial aid to 216 students for the 2016-17 school year.

15.     Alexander Prout was a scholarship student at SPS who went on to a career in business with a specialty in Asian markets. He spent most of his career in Japan, and his three daughters, including F.P., largely grew up in the close-knit, expatriate community in Tokyo. F.P. went to a small Catholic school with a strong network of friends, teachers and parents.

**ANSWER:**     The School admits that Alexander Prout was a scholarship student at the School who worked in business in Japan, and that F.P. grew up, at least in part, in Tokyo and

went to  school there.  The School lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 15.

16.     In March 2011, the family (like everyone in Japan) was rocked by the devastating Tōhoku earthquake and tsunami, which forced them to quickly relocate back to the United States.

**ANSWER:**     The School admits that there was a devastating earthquake and tsunami in Tōhoku, Japan in March 2011.  The School further admits that John and Jane Doe and their family at some point moved to the United States.  The School lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 16.

17.     F.P.'s older sister enrolled at SPS in September 2011.

**ANSWER:**     Admitted.

18.     In relocating to the U.S., F.P. missed her strong social connections and established support network in Japan.

**ANSWER:**     The School admits F.P. likely missed her social connections in Japan but lacks knowledge or information sufficient to form a belief about the nature of her social connections in Japan or the support networks she had in Japan.

19.     F.P.'s family believed SPS, as a residential boarding school, with live-in faculty members was a good choice for her high school education. They believed the school would offer F.P. the kind of supportive environment she had in Japan and would thus allow her to continue to grow socially and academically.

**ANSWER:**     Admitted.

20.     F.P. applied for admission to SPS and was accepted to enter in the fall 2014 term.

**ANSWER:**     Admitted.

21.     Neither F.P. nor her parents were aware of how far SPS had strayed from its Episcopal religious foundations and moral compass.

**ANSWER:**    The School denies that it has or had strayed from its Episcopal religious foundations and moral compass and lacks knowledge or information sufficient to form a belief as to what F.P. and her parents "were aware of."

22.     From the moment freshman girls arrive at the school, they are judged and rated according to appearance.

**ANSWER:**    Denied.

23.     Senior men entrusted as dorm "prefects" and with other honorific titles view the incoming girls as "fresh meat."

**ANSWER:**    Denied.

24.     SPS provided students with the school directory for the upcoming year at the beginning of the school year. The directories contain photographs of the students, including incoming freshmen. Senior men created a tradition of getting together in groups to rate the incoming underage girls in their directories to determine "targets" for "scoring."

**ANSWER:**    The School admits that it, like many schools, provides students with a school directory for the upcoming year at the beginning of each school year, and that the directories contain photographs of that school-year's students at the School.  The School denies the allegations in the last sentence of paragraph 24.  Further answering, to the extent any Sixth-Form (the equivalent of a "senior" at the School) males may have engaged in the activities alleged in paragraph 24, the School states that such activities were not carried out in an open or overt manner, and the School denies that any such behavior that may have occurred constituted a "tradition."  The School denies any implication that the School failed to act, or acted belatedly,

with respect to SPS student conduct that violated School policies, standards, or the law.  The School further states that the terms "underage" and "scoring" are vague.  To the extent "underage" refers to individuals who have not reached the age of majority, most SPS students are underage.  The term "scoring," as it has been generally used by students at the School, refers to a wide range of conduct related to students spending time together.  Consistent with the testimony of students during the Labrie Proceeding, it can mean different things to different people.

25.     The men also rated and otherwise harassed the underage girls as the girls entered the school dining hall three times per day. Senior men did this by sitting on couches in the common area that opens into the dining hall, called "senior couches" that are customarily reserved for seniors. The girls had no choice but to walk past the couches, and undergo ogling and catcalls, to get to the dining hall.

**ANSWER:**     Denied.  The School admits there is a common area near the dining area and there are couches.  It is denied that the School knowingly permitted the rating or harassment of female students and otherwise denies the allegations of paragraph 25.

26.     These rankings take on special significance in the games of sexual conquest in which male students openly competed with one another to "score" or "slay" — meaning to have sexual relations with (generally younger) female students — in a given time period.

**ANSWER:**     Denied.  The School denies that male students openly competed in games of sexual conquest at the School.  The School further states that the terms "score" and "slay" are vague.  The term "scoring," as it has been generally used by students at the School, refers to a wide range of conduct related to students interacting with one another.  Consistent with the testimony of students during the Labrie Proceeding, the term can mean different things to different individuals.  The term "slay" likewise can have different meanings for different people,

but that term has been strongly disavowed on the few occasions when it came to the attention of the School's administration.

27.     As part of these games, male students ranked the female students according to attractiveness and actively pursued the young women in the top ranks.

**ANSWER:**   Denied.

28.     The concept of "scoring" — older men's [sic] tracking their sexual conquests of younger girls — has long been part of SPS' ethos.

**ANSWER:**   Denied.

29.     In or about 2012, an SPS student created a website "scoreboard" to track the sexual conquests of SPS students.  Upon information and belief, the student rumored to host the website was subjected to no discipline and SPS did no further investigation into the widespread practice of older students "scoring" with freshman girls, and did nothing to eliminate it.

**ANSWER:**     Denied.  The School located a hand-written drawing of student names on a wall in a dorm laundry room.  Nothing about the drawing on the wall referenced sexual conquests.  It was generally believed to depict dating or social relationships, known or unknown, between students.  The School painted over the defaced wall and renovated the laundry room to block access to the area where the drawing had been made.  Thereafter, rumors surfaced that the drawing had been re-created on an unknown website location.   The School attempted to locate the website online but could not find it.  The School spoke to a student rumored to host the website and warned him of the consequences of hosting such a website not sanctioned by the School.  The School denies it ever identified the location of the website or its host, and therefore, had no basis to impose any discipline for the rumored website it never located.

30.     This practice was the basis for the Senior Salute, a school tradition dating back at least three years in which graduating senior male students tried, in the spring before commencement, to "score" with as many underclass girls as possible.

**ANSWER:**     Denied.  The "Senior Salute" is not a School-sanctioned or endorsed term or event.  Consistent with the testimony during the Labrie Proceeding, the School understands and believes that the phrase describes a wide range of behaviors related to students spending time with other students, is not a phrase unique to the School, and means a variety of different things to different people and that there is no uniform or singular definition of a "Senior Salute."

31.     The importance of "scoring" was extensively discussed in "The Real Student Handbook: The Little Red Book," an independent study project prepared by an SPS student and for which SPS' rector, Michael G. Hirschfeld (himself an SPS alumnae and parent), served as faculty advisor.

**ANSWER:**     The School admits that the term "scoring" appeared in "The Real Student Handbook: The Little Red Book," which was an independent study project prepared by SPS students.  The School further admits that Rector Hirschfeld, an SPS alumnae and parent, was the faculty advisor for the independent study project.  The School further states that the definition of "score" in "The Real Student Handbook" states: "Do not assume that 'score' means sex here like it does everywhere else."  The School denies any allegations in paragraph 31 not expressly admitted.

32.     This culture of "scoring" was also openly discussed in various pieces published in *The Pelican,* SPS' student newspaper. In one such piece, an SPS student wrote that sexual conquest is a "right of initiation" and an "accepted and expected" part of life at SPS.

**ANSWER:**    The School admits that the term "scoring" has been discussed in several pieces over the last several years—out of the many published over the same time period—in *The Pelican*, the School's student newspaper.  The School denies the allegations in the second sentence of paragraph 32 and further states that it misrepresents the article referenced, which never mentioned "sexual conquest."  Further answering, the School states that the term "score" is vague.  The term "scoring," as it has been generally used by students at the School, refers to a wide range of conduct related to students spending time together.  The term can mean different things to different individuals.  Any allegations in paragraph 32 not explicitly admitted are denied.

33.     For his part, Owen Labrie, a recognized SPS student "leader," wrote about the culture of "scoring" in a 2013 essay in *The Pelican,* inquiring, "Is secret scoring in dirty Schoolhouse closets the key to happiness?"

**ANSWER:**    The School admits that Labrie wrote a piece published in *The Pelican* in 2013 entitled "Learning to Fail."  The School otherwise denies the allegations in paragraph 33, which misrepresent the content of the referenced piece.

34.     In or around 2013, a male SPS student brazenly propositioned Liesbeth Hirschfeld — Rector Michael Hirschfeld's *wife* — to engage in the Senior Salute, erasing any doubt that top SPS administrators were aware of this nefarious tradition. One former longtime SPS faculty member has been quoted as stating, "I don't understand the culture of some of the adults there[.] ... Somebody should have said, 'Senior [S]alute? Not in our school.'" Todd S. Purdum, *Dangerous Privilege,* Vanity Fair, March 2016, at 207.

**ANSWER:**    The School admits that one email was sent in the Spring of 2013, apparently as a prank, to Rector Hirschfeld's wife, Liesbeth Hirschfeld, and mentioned the term

"Senior Salute."  Further answering, the School states that the student from whose account the

email was sent denied he ever sent the email but was the victim of a prank after he left his email

account open on a computer and another individual had used the student's account to send the

prank email.  The School denies that there was a "Senior Salute" "tradition" at SPS and denies

that the referenced email evidences any purported "tradition."  The School admits that the article

referenced in paragraph 34, by Todd S. Purdum, was published in the March 2016 edition of

Vanity Fair, and denies the allegations in the last sentence of paragraph 34 to the extent that they

misquote or mischaracterize that article.  The School is without knowledge or information

sufficient to form a belief as to whether the alleged "former longtime SPS faculty member" was

accurately quoted.  The School denies any allegations in paragraph 34 not explicitly admitted

and denies any implication that the School failed to act, or acted belatedly, with respect to SPS

student conduct that violated School policies, standards, or the law.

35.     Nevertheless, and as recounted in recent media reports, the Senior Salute tradition

of sexual conquest continued through the end of 2013-2014 school year, and neither SPS

institutionally nor any individual SPS administrators put a stop to it.

**ANSWER:**     Denied.

36.     SPS either was, or should have been, aware that Labrie and other senior men had

escalated the Senior Salute tradition by joining the "Slaymakers," a team of competitors in the

Senior Salute founded by Malcolm Salovaara, a 2013 SPS graduate.

**ANSWER:**     Denied.

37.     Upon information and belief, using SPS email, networks, Internet connections,

and other devices, Salovaara, Labrie, and SPS students Patrick McCarthy and Tucker Marchese

formalized the Slaymakers group by, among other things, setting up an Internet chat group to facilitate communications about the Slaymakers' sexual exploits.

**ANSWER:**  Denied.  Labrie, Salovaara and Marchese testified during the Labrie Proceeding that they created a private Facebook chat account referencing the term Slaymakers. Their private account could not be accessed or monitored by the School.  The School states that any other communications between Labrie, Marchese, Salovaara and McCarthy were non-public communications that the School was under no obligation to monitor, and about which the School had no knowledge at the time they occurred.  The School denies that a "Slaymaker" group was ever formalized and recognized in any way at the School.  As to whether the named students used various other communications methods, the School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37.

38.     SPS' Student Handbook indicates: "St. Paul's School reserves the right to monitor and track all behaviors and interactions that take place online or through the use of technology on our property or at our events." The Student Handbook further indicates that students are required to sign a form before the student can use any school technology assenting to SPS' right to monitor and/or access a student's information technology activity.

**ANSWER:**     The School admits that the quoted language in the first sentence of paragraph 38 is the first sentence in the "Privacy" subsection of the Information Technology section of the current Student Handbook.  Further answering, the School states that the purpose of the section is to inform SPS students that they have only a limited expectation of privacy when using technology on School property or at School events and that their use of technology and online conduct is subject to monitoring by the School. The School admits that students sign an agreement before using any school technology.   The School denies any implication that the

Student Handbook created any obligation for the School to monitor online activity, communications or interactions of SPS students, especially every single electronic communication between SPS students on School networks.

39.     The competitive goal for the Slaymakers was to "score" points by engaging in sexual contact, including intercourse, with as many freshman girls as possible in the weeks leading up to commencement. The young men who participated in this competition openly bragged about their intent to "bone," "score," or "slay" as many underage girls as possible.

**ANSWER:**     The School denies that there was any formal group called the "Slaymakers" at SPS and further denies that SPS students "openly bragged" about the matters alleged in paragraph 39.  The School is without knowledge or information to form a belief about the truth of the remaining allegations in paragraph 39.  The School further states that the term "underage" is vague.  To the extent "underage" refers to individuals who have not reached the age of majority, most SPS students are underage.  The School denies any allegations in paragraph 39 not explicitly admitted and denies any implication that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law.

40.     SPS either was, or should have been, aware that Salovaara possessed keys to secluded and secured SPS facilities that the Slaymakers and others used as "hook-up" spots for "scoring."

**ANSWER:**     Denied.

41.     For instance, according to statements made to police, Labrie and his cohorts placed a sofa in a storage shed on the SPS campus for their "scoring."

**ANSWER:**    The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41.  The School acknowledges a sofa was located in a cross country ski team storage shed where ski team members wax skis.  The term "scoring," as it has been generally used by students at the School, refers to a wide range of conduct related to students spending time together.  The term can mean different things to different individuals.

42.    SPS students referred to the shed, pictured below, as the "Mars Hotel," and students have reported that the shed floor was "lined with discarded condoms."

**ANSWER:**    The School admits that the structure pictured below paragraph 42 is formally named the Mars Hotel.  It was designed and built by members of the Form of 1998 with the assistance of a faculty advisor.  The structure bears a plaque naming it as the Mars Hotel.  It is a building actively used by the cross-country ski team and others for storing ski equipment and waxing skis.  The School denies the remaining allegations in paragraph 42.

43.    As the Slaymakers' founding member, Salovaara "passed down" to Labrie keys to locked and secluded SPS buildings, including the keys to a locked, secluded, rooftop room in the building where the assault took place.

**ANSWER:**    The School denies that there was any formal group on the SPS campus named the "Slaymakers," and, therefore, that there was a "founding member."  The School is without knowledge or information to form a belief about the truth of the remaining allegations in paragraph 43.   Further answering, the School denies any implication in paragraph 43 that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law.

44.    The Slaymakers also created and passed down a *papier-mâché* "slaying mask" as well as templates to be used for Senior Salute invitations.

16

**ANSWER:**    The School denies that there was a formal group on the SPS campus named the "Slaymakers."  The School is without knowledge or information to form a belief about the truth of the allegations in paragraph 44.  Further answering, the School denies any implication in paragraph 44 that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law.

45.    The Slaymakers openly communicated their plans to "break the slaying records in the spring [of 2014]" and the group separately made reference to the month of "Slaypril."

**ANSWER:**    The School denies that there was a formal group on the SPS campus named the "Slaymakers," denies that any "group" made any such communications, and therefore denies the allegations in Paragraph 45.  Further answering, the School states that documents filed in the Labrie Proceeding indicate that, in a private electronic message, Salovaara wrote to Labrie: "you should try to break the slaying records in the spring[.]"  The School further states that the word "slaypril" appeared in private emails sent between Labrie and Marchese.  Further answering, the School states that these were non-public communications that the School was under no obligation to monitor, and about which the School had no knowledge at the time they occurred.  The School denies any implication in paragraph 45 that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law.

46.    Labrie and his fellow Slaymakers openly and in the presence of SPS faculty and staff engaged in the ritual of "rubbing" the dining hall engraving of the group's namesake, Robert Barrie Slaymaker, pictured below:

**ANSWER:**    The School denies that there was a formal group on the SPS campus named the "Slaymakers."  The School admits there was testimony in the trial in the Labrie

Proceeding that Labrie had rubbed the engraving of the name of Robert Barrie Slaymaker in the dining hall.  The School denies the remaining allegations in paragraph 46.

      47.     Salovaara celebrated the Slaymakers in the following post to Labrie's public Facebook page:

**ANSWER:**    The School denies that there was a formal group on the SPS campus named the "Slaymakers."  The School is without knowledge or information to form a belief about the truth of the remaining allegations in paragraph 47.  Further answering, the School states that, assuming without admitting that such a post was made, this was a communication on a non-SPS social messaging platform that the School was under no obligation to and did not monitor, and about which the School had no knowledge at the time it occurred.

      48.     Indeed, the Slaymakers' participation in Senior Salute was so central to Labrie's identity at the school that his yearbook message indicated simply "Slaymaker '47: Nuff said."

**ANSWER:**    The School denies that there was a formal group on the SPS campus named the "Slaymakers."  Further answering, Labrie's yearbook message contained at least eight lines of text, none of which referenced the phrase "Senior Salute," and of which the quoted text comprised a small part.  The School is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 48.

      49.     As commencement approached, Labrie and Marchese drafted a "target list" that was communicated on SPS' internal computer networks and included the names of 17 female SPS students with whom the men wished to "score." At least *seven* of these female students were under the age of 16 and therefore unable to give legal consent in New Hampshire.

**ANSWER:**    The School admits only that Labrie sent Marchese an email with a list of names of female SPS students in the Spring of 2014 and provided his explanation during the

Labrie Proceeding about why he created the list, but the School is otherwise without knowledge or information sufficient to form a belief as to the truth of whether the list was a "target list" or as to the purpose of the list.  The School further admits that Labrie sent Marchese the email using the School's email system but denies any implication that the School knew or should have known about the email prior to F.P. reporting the May 30, 2014 incident with Labrie and the subsequent investigation into the incident. The School further admits that certain of the students on the list were under the age of 16.  The remaining allegation is a legal conclusion to which no response is required.  Further answering, the School states that these were non-public communications that the School was under no obligation to monitor and about which the School had no knowledge at the time they occurred.  The School learned of these emails after the investigation into the May 30, 2014 incident between F.P. and Labrie.

50.     One of the listed underage female student targets was F.P.

**ANSWER:**     The School admits that F.P.'s nickname appeared on the list of names that Labrie mailed to Marchese and that F.P. at that time was under 16 years of age.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 50.

51.     The target list formed the basis of a bet between Marchese and Labrie as to which one could "score" the most girls on the list.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51.

52.     Rumors regarding the bet were widely circulated throughout campus in the months leading up to commencement in May 2014.

**ANSWER:**     Denied.

53.     According to documents subsequently filed by the Merrimack County Attorney's office in a criminal case against him, Labrie described his style of "slaying" as to *"feign intimacy... then stab them in the back... THROW EM IN THE DUMPSTER... I lie in bed with them... and pretend like I'm in love."*

**ANSWER:**     The School admits only that the quoted language appears in a purported series of non-public electronic messages sent by Labrie to Salovaara, which were filed by the Merrimack County Attorney's office in the Labrie Proceeding and which the School was under no obligation to monitor and about which the School had no knowledge at the time they occurred.  The School is without information or belief as to the truth of the remaining allegations in paragraph 53.  Further answering, the School states that while the allegations present the quoted language as the uninterrupted voice of Labrie, this language appears as part of a purported private electronic messaging conversation between Labrie and Salovaara, and the quoted text omits intervening messages from Salovaara.

54.     In those same documents, Labrie is reported to have stated, in regards to a young woman who refused his invitation, *"she turned me down...fucking hate forbidden fruit...fuckin girls so much... another dumb cum-bucket struck from my nut sucking, suck it slut, slut fucking bucket list..."*

**ANSWER:**     The School admits only that the quoted language appears in a purported series of non-public electronic messages sent by Labrie to Salovaara, which were filed by the Merrimack County Attorney's office in the Labrie Proceeding and which the School was under no obligation to monitor and about which the School had no knowledge at the time they occurred.  The School is without information or belief as to the truth of the remaining allegations in paragraph 54.  Further answering, the School states that while the allegations present the

quoted language as the uninterrupted voice of Labrie, this language appears, purportedly, as part of a non-public electronic messaging conversation between Labrie and Salovaara, and the quoted text omits intervening messages from Salovaara, as well as other intervening messages from Labrie.  Furthermore, the quoted text modifies one message purportedly sent from Labrie to Salovaara.

55.     The same documents also indicated that Labrie and his counterparts showed a complete disregard for the legal age of consent, communicating, "junior boarding school... 15...and a half... You could be thrown in jail bro... pretty sure the [expletive] was 12... and the [expletive] bum is great...hahaha... HER PREPUBESCENT BUM... LOVE IT... MCCARTHY AND I ARE GONNA BE BAILIN YOU OUT OF JAIL..."

**ANSWER:**     The School admits only that the quoted language appears in a purported series of non-public electronic messages sent between Labrie and Salovaara, which were filed by the Merrimack County Attorney's office in the criminal action against Labrie and which the School was under no obligation to monitor and about which the School had no knowledge at the time they occurred.  Further answering, the quoted text is presented as a single string of messages, without attribution of who sent which message, omitting intervening messages, and leaving unclear who is responding to what message, or whether certain quoted messages are even in response to other messages quoted in paragraph 55 or are instead in response to messages omitted from paragraph 55.  The School is without information or belief as to the truth of the remaining allegations in paragraph 55.

56.     For his part, Rector Hirschfeld admits having heard the terms "slay" and "slayer" as used by male and female students prior to the assault. However, in a speech to students in the

spring of 2015, Hirschfeld stated, *"While these words made me uneasy, I did nothing as the head of the school to address their use nor, to my knowledge, did anyone else."*

**ANSWER:**     The School admits that Rector Hirschfeld heard the terms "slay" and "slayer" used by two students prior to the incident for which Labrie was convicted, and had no understanding the terms "slay" or "slayer" had ever been used by Labrie or any student in the context of sexual relationships between SPS students.  The quoted language was included in a speech Rector Hirschfeld made to SPS students in the spring of 2015 after Labrie's arrest to discourage use of the terms at the School, but the School denies that Rector Hirschfeld understood the terms "slay" or "slayer" to be referring to sexual relationships between SPS students.

57.     In the days leading up to commencement, Hirschfeld and other top SPS officials received but failed to act upon *specific warnings* regarding senior men targeting underage girls.

**ANSWER:**     Denied.

58.     For example, email communications from SPS employees during this time period detailed numerous instances of senior men "seeking out" underage girls in an "inappropriate manner" in or near the girls' dorms.

**ANSWER:**     Denied.  The School admits that it identified several Sixth Form males who had requested permission to visit a Third Form female at a dorm in the Spring of 2014.  The faculty member on duty in the dorm denied the request and reported the incident to certain administrators and faculty supervising residential life.  The Sixth Form males were reprimanded and instructed not to request any such visitations.

59.     Although he indicated that he would address the issue at a meeting of the heads of house, Hirschfeld also indicated that he was "looking forward to graduation," suggesting that his

true hope was that the problem, for that year anyway, would simply go away on its own when school closed for the summer.

**ANSWER:**   The School denies that the communication referenced in paragraph 59 suggests in any way that, and the School denies that, Rector Hirschfeld hoped that any problem affecting the health and well-being of SPS students would "go away on its own" over the summer and denies any implication in paragraph 59 that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law.

60.   Hirschfeld's failure to take this threat seriously is particularly disturbing in light of the New England Association of Schools and Colleges, Inc.'s Commission on Independent Schools' (the "Committee") 2007 finding that SPS should "review policies regarding the supervision of students during the evening hours."

**ANSWER:**   The School denies that it was, or should have been, aware of a "threat" of Sixth Form boys at SPS "targeting" any girls, regardless of age.  The School further denies that Rector Hirschfeld failed to take any such "threat" seriously.  The School admits that the New England Association of Schools and Colleges, Inc.'s Commission on Independent Schools (the "Commission"), in its October 15-17, 2007 "Report of the Visiting Committee" (the "Report"), which was part of the Commission on Independent Schools' process for the continuing accreditation of SPS, included the quoted recommendation.  Further answering, the School states that, as reported in the School's  Two-Year Interim Evaluation Report, provided to the Commission on March 29, 2010, following the Report, the School appointed an Evening Hours Committee to review all policies regarding the supervision of students during the evening hours, and the School implemented numerous changes, including moving up evening check-in times by

half-an-hour, ending intervisitation at the earliest check-in time, encouraging faculty to continue to walk through the residential houses throughout the evening hours to check on students in their individual rooms and in common rooms in order to promote quiet study conditions, and keeping faculty on evening duty in the houses up to thirty minutes after the final senior check-in of 10:00 p.m. to ensure the house has quieted down and students are going to bed at a reasonable hour.

61.     The Committee also noted that SPS should "examine whether or not students are using their free evening hours productively and getting to bed at a reasonable hour ..." and "re-examine the balance between student freedom and institutional responsibility to ensure that supervision and safety are not compromised by idealism."

**ANSWER:**     The School admits that the Report contains the quoted language.  Further answering, the School states that, as reported in the School's  Two-Year Interim Evaluation Report, provided to the Commission on March 29, 2010, following the 2007 report, the School appointed an Evening Hours Committee to review all policies regarding the supervision of students during the evening hours, and the School implemented numerous changes, including moving up evening check-in times by half-an-hour, ending intervisitation at the earliest check-in time, encouraging faculty to continue to walk through the residential houses throughout the evening hours to check on students in their individual rooms and in common rooms in order to promote quiet study conditions, and keeping faculty on evening duty in the houses up to thirty minutes after the final senior check-in of 10:00 p.m. to ensure the house has quieted down and students are going to bed at a reasonable hour.  Further, the School established a separate Residential Life curriculum to help Third Formers transition into the SPS community and to learn information about a variety of health topics.

62.    SPS failed to heed any of those recommendations.

**ANSWER:**    Denied.

63.    Because of this deliberate indifference and SPS' failure to take any meaningful

steps to do anything about the Senior Salute tradition, Labrie and his Slaymaker cohorts were

able, in furtherance of their competition, to arrange private nighttime meetings with SPS female

students to, as Labrie described it in his essay in *The Pelican,* "scor[e] in dirty Schoolhouse

closets."

**ANSWER:**    Denied.

64.    SPS similarly turned a blind eye to Labrie's reputation as a sexual predator. For

example, in Spring 2014, a female student reported to a senior administrator that Labrie had been

"overly aggressive" in a sexual experience, by, among other things, biting her and pulling her

hair.

**ANSWER:**    Denied.

65.    SPS took *no* significant action to investigate these and other instances of

aggressive sexual behavior by Labrie.

**ANSWER:**    The School denies that it had knowledge or information of any "instances

of aggressive sexual behavior by Labrie" prior to the May 30, 2014 incident between F.P. and

Labrie.

66.    Had SPS conducted the careful investigation that was plainly warranted, and

taken appropriate action, Labrie's competition with Marchese — and the actions of the

Slaymakers in general — could have been easily prevented.

**ANSWER:**    Denied.

67.     In his competition with Marchese, Labrie focused particularly on F.P., with whom he was acquainted through her older sister.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67.

68.     From the time F.P. arrived on campus, Labrie showed a strong sexual interest in her.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68.

69.     Prior to the sexual assault, F.P. was sexually naïve and inexperienced.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to whether F.P. was sexually naïve and inexperienced prior to the incident with Labrie.

70.     In January 2014, Salovaara asked Labrie via Facebook, "who do you want to pork more than anyone bro?" Labrie quickly replied with F.P.'s name.

**ANSWER:**     The School admits only that the alleged interaction between Salovaara and Labrie, which appears to have been made via non-public Facebook messenger, appeared in documents which were filed by the Merrimack County Attorney's office in the Labrie Proceeding, which messages the School was under no obligation to monitor and about which the School had no knowledge at the time they occurred and learned of only as they became available in connection with the Labrie Proceeding. The School is without knowledge or information sufficient to form a belief as to the truth of any remaining allegations in paragraph 70.

71.     In March 2014, Labrie, in a communication with a subject line referencing "Slaypril and Slay," discussed with Marchese Labrie's intention to engage in "an eight week

exercise in debauchery" during the months of April and May. In listing the female students with whom he wanted to "score," Labrie wrote only one name entirely in capital letters — F.P.'s.

**ANSWER:**    The School admits that on March 24, 2014, Labrie sent an email to Marchese containing the words "slaypril and slay" in the subject line and containing the words "an eight week exercise in debauchery" in the text of the email.  Further answering, the School states that the email is the best evidence of its contents and denies the allegations in the first sentence of paragraph 71 to the extent they are inconsistent with the express language of the email.  The School denies that there was any list of female students in the referenced email. Further answering, the School had no obligation to monitor email communications, and had no knowledge of the March 24, 2014 email communication from Labrie to Marchese at the time it was made.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been reported to the School and the subsequent investigation that it learned of this email communication.

72.    On May 28, 2014, at 12:50 p.m., just four days before commencement, Labrie sent F.P. an email from his school account to her school account, stating:

> while the thought of my name in your inbox makes me blush perhaps more than it should, there's something I want to share with you and my evenings left to do it are growing fewer by the evening. there's a door here that's been locked since before we were born, but in a moment of divine intervention the night before last, its hinges swung open in my hands. if you want a definition of the word bittersweet, think of me spending three years trying to open it yet now only having three nights to remember the view. i want to invite you to come with me, to climb these hidden steps, and to bask in the nicest view millville has ever had to offer. i hope you're all right with heights.
> if you're not otherwise engaged, mull it over. i ask only you let me know soon—these days they're not making time quite like they used to.
> yours,
> owen

**ANSWER:**     The School admits the allegations in paragraph 72, but further states that it had no obligation to monitor such email communications and had no knowledge about this email communication at the time it occurred.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been reported to the School and the subsequent investigation that it learned of this email communication.

73.     Attached to the message was a photograph of a wall, located above an archway on campus that was painted with the message, "Believe in Angels."

**ANSWER:**     Admitted.

74.     Upon information and belief, Labrie had sent virtually the same invitation to other SPS students as part of his participation in the Senior Salute.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74.

75.     F.P. replied at 9:09 p.m., indicating:

> owen,
>
> while the thought of your name in my inbox gives me a sense of dejavu, ([my sister] and I are very close sisters,) and although I would like to climb those hidden steps with you, I have to decline. I would like to climb that, not the list of third formers that have spent quality time with you.

**ANSWER:**     The School admits that F.P. sent an email to Labrie at 9:09 p.m. on May 28, 2014 containing the quoted language, with the exception of the "[my sister]" language which is modified from the original email, but further states that it had no obligation to monitor such email communications and had no knowledge about this email communication at the time it occurred.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been

28

reported to the School and the subsequent investigation that it learned of this email communication.

76.     Labrie replied a few hours later, after midnight on May 29, 2014, indicating:

> probably one of the sassier emails i've ever received, my sweet lord, and minus chavez and macintyre, I'm afraid that list is slimmer than you might think. pretty much nonexistent this term, even. but do as you please, mon chere, I'd have taken you either way.

**ANSWER:**     The School admits that Labrie sent an email to F.P. at 12:12 a.m. on May 29, 2014 containing the quoted language, in addition to other language not included in paragraph 76, but further states that it had no obligation to monitor such email communications and had no knowledge about this email communication at the time it occurred.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been reported to the School and the subsequent investigation that it learned of this email communication.

77.     Later that same night, Labrie sent messages to classmate O.M., a mutual friend of his and F.P.'s, asking him to try to get her to reconsider the invitation — "to put in a good word for me," as described in documents subsequently filed by the Merrimack County Attorney's office in a criminal case against Labrie. O.M. was working on a science project with F.P. when he showed her these messages from Labrie. O.M. told  F.P. that rumors concerning sexual experiences between Labrie and other female students were untrue and Labrie was a good guy. F.P. considered O.M. to be a trusted friend and she believed his representations.

**ANSWER:**     The School admits only that documents filed by the Merrimack County Attorneys' office in the Labrie Proceeding state that Labrie asked O.M. to try to get F.P. "to reconsider the invitation—'to put in a good word for me.'"  The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the

time they occurred, and it learned about them only as they were presented in connection with the Labrie Proceeding.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 77.

78.     Based on O.M.'s vouching for Labrie, F.P. agreed to accept Labrie's invitation.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78.

79.     F.P. sent an email to Labrie later that same evening agreeing to meet.

**ANSWER:**     The School admits that F.P. sent an email to Labrie on May 29, 2014 stating:  "C'est vrai, s'il vous plait, pardonnez moi. Oui…Only if its our petit secret," but further states that it had no obligation to monitor such email communications and had no knowledge about this email communication at the time it occurred.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been reported to the School and the subsequent investigation that it learned of this email communication.

80.     The next day, on May 30, 2014, Labrie used Facebook messaging to communicate with F.P.

**ANSWER:**     The School admits only that documents filed by the Merrimack County Attorneys' office in the Labrie Proceeding state that Labrie and F.P. used non-SPS, non-public Facebook messaging to communicate on May 30, 2014. The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the time they occurred, and it learned about them only as they were presented in connection with the Labrie Proceeding.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 80.

81.    He asked her "how is your night looking I have dinner from like 7-9."

**ANSWER:**    The School admits only that documents filed by the Merrimack County Attorneys' office in the Labrie Proceeding state that Labrie sent F.P. a non-SPS, non-public Facebook message with the quoted language. The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the time they occurred, and it learned about them only as they were presented in connection with the Labrie Proceeding.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 81.

82.    She replied "I also have dinner but the rest of my night is pretty clear."

**ANSWER:**    The School admits only that documents filed by the Merrimack County Attorneys' office in the Labrie Proceeding state that F.P. sent Labrie a non-SPS, non-public Facebook message stating:  "I also have dinner then but the rest of my night is pretty clear."  The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the time they occurred, and it learned about them only as they were presented in connection with the Labrie Proceeding.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 82.

83.    Labrie stated "golden, golden . . . it might be a little crazy for the tower but I can take you somewhere else that is pretty sweet jesus my chat isn't working i'll let you know on the book when i am back."

**ANSWER:**    The School admits only that documents filed by the Merrimack County Attorneys' office in the Labrie Proceeding state that Labrie sent F.P. a non-SPS, non-public Facebook message containing language similar to that quoted in paragraph 83, but that the text

was formatted differently. The School further states that it was under no obligation to monitor

such messages, it had no knowledge of any such messages at the time they occurred, and it

learned about them only as they were presented in connection with the Labrie Proceeding.  The

School is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 83.

84.     F.P. responded: "Sounds good."

**ANSWER:**     The School states that documents filed by the Merrimack County

Attorneys' office in the Labrie Proceeding state that F.P. sent Labrie a non-SPS, non-public

Facebook message, in response to the message Labrie sent to F.P. and identified in paragraph 83,

stating: "That sounds perfect haha."  The School further states that it was under no obligation to

monitor such messages, it had no knowledge of any such messages at the time they occurred, and

it learned about them only as they were presented in connection with the Labrie Proceeding.  The

School is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 84.

85.     The two arranged to meet outside the front door of a building on campus at 9:15

p.m.

**ANSWER:**     The School admits only that documents filed by the Merrimack County

Attorneys' office in the Labrie Proceeding indicate that F.P. and Labrie agreed, via non-SPS,

non-public Facebook messages, to meet at 9:15 "outside the schoolhouse front door." The

School further states that it was under no obligation to monitor such messages, it had no

knowledge of any such messages at the time they occurred and learned about them only as they

were presented in connection with the Labrie Proceeding.  The School is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 85.

86.     At 9:02 p.m., Labrie sent Salovaara a message stating, "I'M SLAYIN [F.P.]" Labrie continued to send messages to Salovaara before and after Labrie's assault of F.P. that evening.

**ANSWER:**     The School admits only that documents filed by the Merrimack County Attorneys' office in the Labrie Proceeding state that Labrie sent Salovaara a non-SPS, non-public message containing language similar to that quoted in paragraph 86. The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the time they occurred and learned about them only as they were presented in connection with the Labrie Proceeding.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 86.

87.     Labrie showed up at the prearranged meeting spot at 9:15 p.m. Unbeknownst to F.P., he had a blanket and a condom in his backpack.

**ANSWER:**     The School states that only F.P. and Labrie know what happened between them on the evening of May 30, 2014 and further recognizes that each provided testimony of their own accounts of that evening during trial in the Labrie Proceeding.  Thus, the School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87.

88.     They met and started walking toward the Lindsay Center for Mathematics and Science Building (the "Lindsay Building"). When Labrie noticed that there was a security car and several parents' vehicles in front of the building, he took F.P. around to the back of the building. The two proceeded through an unlocked door at the Lindsay Building and up five

flights of stairs to a locked door, for which Labrie had a key that he had obtained from the Slaymakers. Labrie led F.P. through a dark and noisy machine-room to another locked door, which he also unlocked with a key, allowing access to the roof.

**ANSWER:**    The School states that only F.P. and Labrie know what happened between them on the evening of May 30, 2014 and further recognizes that each provided testimony of their own accounts of that evening during trial in the Labrie Proceeding.  Thus, the School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88.

89.    Labrie proceeded to engage in numerous forms of sexual contact with F.P. including kissing, digital penetration, oral sex and unprotected vaginal penetration. F.P. told Labrie "no" on at least three occasions and did not consent to any vaginal contact—and could not have consented as a matter of New Hampshire law—based on her age.

**ANSWER:**    The School states that only F.P. and Labrie know what happened between them on the evening of May 30, 2014 and further recognizes that each provided testimony of their own accounts of that evening during trial in the Labrie Proceeding.  Thus, the School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 89.  Further answering, the allegation regarding the legal age of consent under New Hampshire law is a legal conclusion to which no response is required.

90.    When the assault ended, F.P. was confused and upset.

**ANSWER:**    The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90.

91.     Labrie looked at F.P.'s cell phone and noticed that the time was close to the time he had to check in at his dorm. Both he and F.P. were required to check into their dorms by a certain time.

**ANSWER:**     The School acknowledges that there are set check-in times for its students. Further answering, the School states that only F.P. and Labrie know what happened between them on the evening of May 30, 2014 and further recognizes that each provided testimony of their own accounts of that evening during trial in the Labrie Proceeding.  Thus, the School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91.

92.     Labrie left to return to his dorm, abandoning F.P. in the dark machine-room.

**ANSWER:**     The School states that only F.P. and Labrie know what happened between them on the evening of May 30, 2014 and further recognizes that each provided testimony of their own accounts of that evening during trial in the Labrie Proceeding.  Thus, the School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92.

93.     Throughout the assault and thereafter, Labrie treated F.P. as just another tally mark for the Senior Salute — dehumanizing and objectifying her in every way possible.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93.

94.     F.P. emerged from the Lindsay Building stunned and largely in shocked disbelief as to what had happened. When she encountered a fellow student, G.H., she said, "I think I had just had sex with Owen." G.H. later told police that, at this time, J.D. [sic] "wasn't herself."

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 94.  The School admits that F.P. encountered G.H. in the Lindsay Building and made comments referencing that she thought she had sex with Labrie and admits the allegations in the last sentence of paragraph 94.

95.     F.P. returned to her dorm for her scheduled check-in.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95.

96.     F.P. reported the sexual assault to several students in her dorm and she was afraid and upset about it.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96.

97.     F.P.'s friends and other students in the dorm observed that she was upset and in physical pain. At the insistence of two of her friends, F.P. showed them red marks on her breasts and stomach that had been caused by Labrie.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97.

98.     F.P. told her friends that she was not sure whether Labrie had used a condom. F.P.'s friends immediately expressed concerns about potential pregnancy and sexually transmitted diseases.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98.

99.     F.P. was with her friends when she received a message from Labrie indicating, "you're an angel."

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of what F.P. received from Labrie, or who, if anyone, F.P. was with when she received it, but admits that Labrie sent an email to F.P. on May 30, 2014 at 10:37 p.m. stating: "[F.P.] you're an angel. much love."  Further answering, the School states that it had no obligation to monitor such email communications and had no knowledge about this email communication at the time it occurred.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been reported to the School and the subsequent investigation that it learned of this email communication.

100.     At the encouragement of her friends, F.P. wrote back friendly messages designed to keep the dialog open and obtain information about whether Labrie had used a condom during the assault.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of what any messages F.P. wrote to Labrie were "designed" to do and whether messages F.P. wrote to Labrie were sent at the encouragement of friends, and admits only that F.P. and Labrie sent several other emails to each other following the email identified in paragraph 99.  The School denies the allegations in paragraph 100 to the extent it mischaracterizes or differs from the express language of those emails.  Further answering, the School states that it had no obligation to monitor such email communications and had no knowledge about these email communications at the time they occurred.  It was not until after the May 30, 2014 incident between F.P. and Labrie had been reported to the School and the subsequent investigation that it learned of this email communication.

101.    In a series of messages, Labrie asked F.P. if she was on birth control, and he acknowledged to her that he had put a condom on "halfway through."

**ANSWER:**    The School admits only that certain documents filed and testimony given in the Labrie Proceeding indicated that Labrie and F.P. engaged in non-public Facebook messaging which included a discussion of birth control and whether Labrie had worn a condom. The School denies paragraph 101 to the extent its characterization of any such messages differs from the express content of such messages.  The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the time they occurred, and it learned about them only as they were presented in connection with the Labrie Proceeding. The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 101.

102.    A couple hours after the assault, Marchese asked Labrie via Facebook messaging how the assault of F.P. had gone from "from no to bone?" Labrie replied that he used "every trick in the book," including cunnilingus.

**ANSWER:**    The School admits only that documents filed by the Merrimack County Attorney's office in the Labrie Proceeding state that Marchese and Labrie engaged in non-public Facebook messaging and that these documents describe the messages using language similar to that used in paragraph 102.  The School denies paragraph 102 to the extent its characterization of any such messages differs from the express content of such messages.  The School further states that it was under no obligation to monitor such messages, it had no knowledge of any such messages at the time they occurred, and it learned about them only as they were presented in

connection with the Labrie Proceeding.  The School is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 102.

103.    According to testimony at Labrie's criminal trial, he also told classmates O.M.,

A.T., and H. K. during this time that he had sex with F.P.

**ANSWER:**    The School states that transcripts of the testimony from the trial in the

Labrie Proceeding are the best evidence of such testimony and denies any characterization

inconsistent with the testimony.  The School further states that it had no knowledge of any such

communications by Labrie to the individuals mentioned, and it learned about them only in

connection with the Labrie Proceeding.

104.    On Saturday, May 31, 2014, F.P. went to SPS' health center, the Clark House.

Still upset and confused about what had happened and afraid to disrupt her sister's graduation,

F.P. told the nurse there that the sexual contact was consensual. F.P. asked for Plan B emergency

contraception.

**ANSWER:**    The School admits that F.P. went to Clark House on Saturday, May 31,

2014, that F.P. told a nurse there that she had engaged in unprotected sexual intercourse with a

student F.P. declined to identify, that F.P. also told the nurse that the sexual intercourse was

consensual and not coerced, and that F.P. asked for Plan B emergency contraception.  The

School is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 104.

105.    The following day was F.P.'s sister's commencement, after which her family left

to return home.

**ANSWER:**    The School admits that its commencement ceremony was on June 1, 2014

and that F.P.'s sister graduated on that day.  The School is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 105.

106.    Late in the evening on Monday, June 2, 2014, students in F.P.'s dorm overheard her sobbing and called the faculty resident of the dorm, Dr. Theresa Gerardo-Gettens, to speak with F.P. F.P. asked Dr. Gerardo-Gettens words to the effect of "what if somebody had sex with me and I did not want them to and said no?" Dr. Gerardo-Gettens advised F.P. to call her mother and instructed her "how you handle this will inform the rest of your life." Despite clearly suspecting that F.P. was reporting a rape to her, Dr. Gerardo-Gettens failed to inform authorities.

**ANSWER:**    Denied.  Further answering, the School states that on the evening of June 2, 2014, Dr. Gerardo-Gettens heard what she thought were students laughing in the hall of the dorm and went out to quiet them down.  She found two girls hugging and saw that F.P. was crying.  Dr. Gerardo-Gettens brought F.P. to Dr. Gerardo-Gettens' residence to talk.  F.P. told Dr. Gerardo-Gettens that she was upset about a mean Facebook post someone had made.   F.P. had said her parents did not know about this, and so Dr. Gerardo-Gettens encouraged F.P. to contact her parents, because parents always want to know when their children are upset.  F.P. did not make any reference to sex, sexual assault, or physical assault to Dr. Gerardo-Gettens, and Dr. Gerardo-Gettens did not suspect—and had no reason to suspect—that F.P. was talking about anything other than a Facebook post.

107.    Near midnight, F.P. called her mother, crying hysterically, and reported what had happened to her.

**ANSWER:**    The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107.

108.    The next morning, on June 3, 2014, her mother traveled back to SPS and took F.P. to the Concord Hospital, where she received a sexual-assault forensic examination, made a brief report to the Concord Police Department, and arranged for a full forensic police interview the following day.

**ANSWER:**    The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108.   Further answering, the School states that on or around June 3, 2014, F.P.'s mother reached out to a counselor at the School and stated that F.P. had told her (F.P.'s mother) that she had suffered a sexual assault at the School.  The School immediately reported this information to the Concord Police Department.

109.    The Concord Police Department took a full statement from F.P. on June 4, 2014.

**ANSWER:**    The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109.

110.    Concord Police contacted Labrie on June 11, 2014, and questioned him in person on June 12, 2014.

**ANSWER:**    The School admits only that testimony by Concord Police detectives during the Labrie Proceeding indicated that Concord Police detectives spoke with Labrie by telephone on June 11, 2014 and in person on June 12, 2014.  The School is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110.

111.    After questioning by the Concord Police, Labrie deleted incriminating conversations with Marchese, along with more than *100* other Facebook conversations. These were later recovered by police.

**ANSWER:**   The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111, and states only that testimony of Concord Police detectives during the Labrie Proceeding and statements contained in the Merrimack County Attorney's office's objection to Labrie's motion to set aside the verdict in the Labrie Proceeding asserts that Labrie deleted a Facebook conversation with Marchese, as well as 100 other Facebook conversations, which were later recovered by police.

112.   According to information provided to police, Labrie previously had sexual relations with at least one other underage SPS student, possibly in the same room where he assaulted F.P.

**ANSWER:**   The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112.  Because the Labrie Proceeding is pending appeal, the School does not have access to police investigative records related to the Labrie Proceeding.

113.   Labrie's arrest was publicized to the student body by SPS administrators and the school community was widely aware that F.P. was the victim.

**ANSWER:**   The School denies that SPS administrators "publicized" Labrie's arrest to SPS students.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 113 and further states that "the school community" is a vague term which is used and applied in different ways and in different contexts.

114.   Fully expecting the SPS community to rally around her as a sexual-assault victim, F.P. returned to SPS in August 2014.

**ANSWER:**    The School admits F.P. returned to SPS in August 2014 and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 114.

115.    F.P. and her family were shocked at the degree to which F.P. was shunned, ignored, and outright mocked after her return to the school.

**ANSWER:**    The School denies that the School, and its faculty and administration, shunned, ignored or mocked F.P. after she returned to the School.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 115.   Further answering, the School states that it took steps to ease F.P.'s return in every way.

116.    Most of F.P.'s former friends, other SPS students, and all but a few supportive faculty members, avoided her.

**ANSWER:**    The School admits that faculty members were supportive of F.P. and denies any implication that they were not.  The School is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 116.

117.    The school community's attitude toward the assault is best exemplified by an experience F.P. had during a school-wide chapel service that occurred after she came back to SPS. At the service, two boys stood up to speak on an unrelated topic and made a joke about the "age of consent." All eyes turned to F.P. and attendees at the chapel erupted in laughter. No one, including the rector, did anything to address the students' mockery of the assault she suffered.

**ANSWER:**    The School acknowledges two students made a joke while making announcements at chapel referencing the age of consent and denies all other allegations in paragraph 117.

118.    F.P. was also subject to outright bullying. In one incident, the SPS men's hockey team — the top of the social order at the school — intimidated her as she walked by on one of her first days back to school at the start of the new term, standing in unison, pointing and staring her down.

**ANSWER:**    Denied.  The School denies that F.P. was subject to bullying or that the hockey team stood in unison pointing and starting her down.

119.    Though Alexander and Susan Prout constantly communicated these incidents of retaliation to school officials, those officials took no meaningful action to address them.

**ANSWER:**    Denied.

120.    SPS proved to be such a hostile and unwelcoming environment that F.P. left the school in December 2014 and never returned.

**ANSWER:**    Denied, except the School admits F.P. terminated attendance at the School in December 2014.

121.    On July 16, 2014, Labrie was arrested and charged with: (a) three counts of aggravated felonious sexual assault; (b) three counts of misdemeanor sexual assault; (c) one count of endangering the welfare of a child; (d) one count of the felony of "certain uses of computer services prohibited"; and (e) one count of simple assault.

**ANSWER:**    Admitted.

122.    Labrie was offered numerous plea deals, one of which he preliminarily accepted. However, after the plea hearing was scheduled and F.P. and her family had made arrangements to appear, Labrie fired his counsel and withdrew from the deal. Labrie ultimately fired three local attorneys before, with financing from the SPS community, hiring attorney Jay Carney, who is famed for representing organized-crime leader Whitey Bulger.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first two sentences of paragraph 122.  The School denies that Labrie hired attorney Jay Carney with financing from "the SPS community," which is a vague term which is used and applied in different ways and in different contexts.  The School denies that it, its administration, or its faculty financed Labrie's defense costs for the criminal proceeding.

123.     In a thinly veiled effort to harass and intimidate F.P. and her family, Carney hired private investigators to travel more than a thousand miles to the family's new home to question friends and neighbors who knew nothing about the case. Among the people questioned was the young daughter of F.P.'s sister's third-grade teacher.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123.

124.     The criminal trial was conducted in the Superior Court of Merrimack County, New Hampshire, in August 2015. F.P. missed the first two weeks of her junior year of high school to attend.

**ANSWER:**     The School is without knowledge or information sufficient to form a belief as to the truth of the allegation that F.P. missed the first two weeks of her junior year of high school to attend the trial, but otherwise admits the allegations in paragraph 124.

125.     The trial was covered by virtually every major national media outlet and was described by many as a "media circus."

**ANSWER:**     The School admits that local and national media covered the trial and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 125.

126.    During the opening statements of the trial, F.P.'s name was inadvertently broadcast on several media sites, leading to extreme invasions of her privacy, as discussed below.

**ANSWER:**    The School admits that F.P.'s name was broadcast on several media sites, but is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126.

127.    F.P. recounted in her victim impact testimony that she "threw up at least two times" each day before trial because of the stress of the proceedings.

**ANSWER:**    The School admits F.P. made this statement in her victim impact statement and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 127.

128.    F.P. was subjected to grueling cross-examination by Carney, who, among other things, called her a "liar."

**ANSWER:**    The School admits only that F.P. was cross-examined by attorney Carney, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 128.  Further answering, the School states that the best evidence of attorney Carney's questions and statements during his cross-examination of F.P. are the trial transcripts.

129.    Carney also made repeated references to the Senior Salute and SPS' failure to take any action to prevent this "tragedy."

**ANSWER:**    The School states that the best evidence of attorney Carney's questions and statements during his cross-examination of F.P. are the trial transcripts and denies the allegations in paragraph 129 to the extent they are inconsistent with the transcripts.  Further

answering, the School denies any implication that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law.

130.   On August 28, 2015, a jury found Labrie guilty of three counts of misdemeanor sexual assault, one count of the felony of "certain uses of computer services prohibited," and one count of endangering the welfare of a child.

**ANSWER:**   Admitted.

131.   F.P. and her family have been devastated in virtually every way by SPS' failure to fulfill its duty to protect F.P. from this known risk that she would be sexually harassed and assaulted.

**ANSWER:**   Denied.

132.   F.P. has suffered, and will continue to suffer for the rest of her life, severe emotional distress stemming from the May 30, 2014, assault.

**ANSWER:**   The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132.

133.   Because F.P.'s name was broadcast to the world, her sense of privacy has been shattered. Her name and identity have been widely circulated on the Internet. Examples of the depraved online postings about F.P. and her family, redacted versions of which are posted below, include:

> a.   pictures of F.P. with her 8-year-old sister;
>
> b.   family photographs;
>
> c.   detailed pictures of F.P.'s family home along with its street address and value;

d.      her being labeled an "attention whore at St. Paul's School who lied to slime an innocent bro with a fake-rape charge";

e.      a threat indicating, "i [*sic*] know my ivy frat bros are putting a target on her, she is gonna get used and abused"; and

f.      an entry indicating the writer's "hope she gets a bit of desperately needed backdoor action."

**ANSWER:**      The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133.   Further answering, the School denies any implication that the School failed to act, or acted belatedly, with respect to SPS student conduct that violated School policies, standards, or the law and denies that any divulgence of F.P.'s name or any of the alleged online postings are in any way the result of actions or omissions on the part of the School.

134.    F.P.'s father had to leave his overseas job to support his family through the criminal trial, resulting in disastrous financial losses for the family.

**ANSWER:**      The School is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134.

135.    F.P. and her family are greatly disturbed by the extent to which the school they once loved so dearly has disappointed them in so many ways. Almost equally as shocking as the school's failure to deal with what Labrie described as widespread "debauchery" is SPS' complete unwillingness to accept any responsibility or to engage in any meaningful reform that would result in real change to protect future children from harm.

**ANSWER:**      The School denies the allegations in the last sentence of paragraph 135. The School is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 135.

**COUNT ONE**

*Breach of Fiduciary Duty*

136.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

**ANSWER:**    The School incorporates its answers to all of the foregoing paragraphs as if fully set forth herein.

137.    F.P. enrolled at SPS as a residential boarding student in the fall 2013, when she was 14 years old.

**ANSWER:**    Admitted.

138.    Defendant had a fiduciary relationship with F.P., a residential student and minor. As a New Hampshire educational institution, SPS owed F.P. a special duty of trust and confidence to ensure her safety and wellbeing.

**ANSWER:**    The allegations in paragraph 138 are legal conclusions to which no response is required.

139.    Defendant, through Hirschfeld and SPS' Board of Trustees, administrators, faculty, or staff, breached their duty owed to F.P. by, among other things:

      a.    Failing to properly protect F.P., a minor, from sexual abuse;

      b.    Improperly protecting F.P., a minor, from sexual abuse;

      c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

49

      d.      Failing to investigate, correct and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

      e.      Failing to investigate, prevent, and/or otherwise address references to "scoring" made in student publications;

      f.      Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

      g.      Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

      h.      Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

      i.      Failing to promptly report F.P.'s sexual assault to the authorities;

      j.      Failing to take any action to prevent retaliation against F.P. when she returned to the school;

      k.      Failing to conduct an exit interview with F.P. when she left the school; and

      l.      Failing to heed numerous warnings regarding after- hours security and lax disciplinary policies.

**ANSWER:**    Denied.

140.    Defendant, through its Board of Trustees, administrators, faculty, or staff, knew or should have known that it had created an opportunity for Labrie to, and increased the likelihood that he would, sexually assault F.P.

**ANSWER:**    Denied.

141.    Defendant's conduct was wanton, malicious, or oppressive, in that, Defendant exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

**ANSWER:**    Denied.

142.    As a direct and proximate cause of Defendant's violation of its fiduciary duty to her, F.P. experienced, and continues to experience, severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**ANSWER:**    Denied.

## COUNT TWO

*Negligence*

143.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

**ANSWER:**    The School incorporates its answers to all of the foregoing paragraphs as if fully set forth herein.

144.    In the fall 2013, F.P. enrolled at SPS and was thereby deprived of the protection of her parents.

**ANSWER:**    The School admits that F.P. enrolled in the fall of 2013, but denies the remaining allegations in paragraph 144.

145.    Upon F.P.'s enrollment, Defendant assumed custody of her and other students housed on the school's premises.

**ANSWER:**    The allegations in paragraph 145 constitute legal conclusions to which no answer is required.  Further answering, the School states that parents or guardians have legal custody over students who are enrolled in and housed at the School.

146.    In so doing, Defendant entered into a relationship with F.P. that imposed on it a duty of reasonable care, including, among other things, a duty of supervision to protect F.P. from reasonably foreseeable harm.

**ANSWER:**    The allegations in paragraph 146 constitute legal conclusions to which no answer is required.

147.    Defendant, through Hirschfeld and SPS' Board of Trustees, administrators, faculty, or staff, breached its duty owed to F.P. by, among other things:

      a.    Failing to properly protect F.P., a minor, from sexual abuse;

      b.    Improperly protecting F.P., a minor, from sexual abuse;

      c.    Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

      d.    Failing to investigate, terminate, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

      e.    Failing to investigate, prohibit, and/or otherwise address references to "scoring" made in student publications;

      f.      Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

      g.      Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

      h.      Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

      i.      Failing to promptly report F.P.'s sexual assault to the authorities;

      j.      Failing to take any action to prevent retaliation against F.P. when she returned to the school;

      k.      Failing to conduct an exit interview with F.P. when she left the school; and

      l.      Failing to heed numerous warnings regarding after- hours security and lax disciplinary policies.

**ANSWER:**   Denied.

148.    SPS, through its Board of Trustees, administrators, faculty, or staff, knew or should have known that they had created the opportunity for Labrie to, and increased the likelihood that he would, sexually assault F.P.

**ANSWER:**   Denied.

149.    Defendant's conduct was wanton, malicious, or oppressive, in that, Defendant exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

**ANSWER:**    Denied.

150.    As a direct and proximate cause of Defendant's violation of its duty of care to her, F.P. experienced, and continues to experience, severe emotional distress accompanied by physical manifestations (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**ANSWER:**    Denied.

## COUNT THREE

### *Premises Liability*

151.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

**ANSWER:**    The School incorporates its answers to all of the foregoing paragraphs as if fully set forth herein.

152.    While on its premises, F.P. was a business invitee of SPS.

**ANSWER:**    The allegations in paragraph 152 constitute legal conclusions to which no answer is required.

153.    SPS owed F.P. a duty to use reasonable care under all circumstances in the maintenance and operation of the premises, and to take reasonable precautions to protect her against foreseeable dangers arising out of the arrangements or use of the premises.

**ANSWER:**    The allegations in paragraph 153 constitute legal conclusions to which no answer is required.

154.   SPS, through its Board of Trustees, administrators, faculty, or staff, failed to act with reasonable care to protect F.P. and her fellow female students from foreseeable dangers of which SPS had ample actual notice, including, among other things:

   a.   Failing to properly protect F.P., a minor, from sexual abuse;

   b.   Improperly protecting F.P., a minor, from sexual abuse;

   c.   Allowing Labrie and other male students to foster an environment of sexual harassment and objectification of SPS' female students;

   d.   Allowing the Slaymakers to gain illicit access to SPS' facilities for their sexual exploits, as well as use its email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those sexual exploits;

   e.   Allowing Labrie to illicitly gain access to the Lindsay Building machine room, where he sexually assaulted F.P.;

   f.   Disregarding warnings regarding insufficient security and overly lax disciplinary policies;

   g.   Failing to properly secure keys to remote buildings commonly used by senior men to engage in sexual activity with underage girls; and

   h.   Failing to supervise students after hours.

   **ANSWER:**   Denied.

155.   SPS knew or should have known that SPS had created the opportunity for Labrie to, and increased the likelihood that he would, sexually assault F.P.

   **ANSWER:**   Denied.

156.   As a direct and proximate result of SPS' negligence, F.P. experienced, and continues to experience, severe emotional distress accompanied by physical manifestations (such

as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to

sleep), and other harms to be established at trial.

**ANSWER:**    Denied.

157.    SPS' conduct was wanton, malicious, or oppressive, in that, the school exhibited

reckless indifference to or disregarded the foreseeable risks of harm, it acted with ill will, hatred,

hostility, a bad motive, or the intent to abuse its power.

**ANSWER:**    Denied.

## COUNT FOUR

*Intentional Infliction of Emotional Distress*

158.    Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

**ANSWER:**    The School incorporates its answers to all of the foregoing paragraphs as if

fully set forth herein.

159.    Defendant intended to cause F.P. emotional distress or acted with reckless

disregard to the certainty that they would cause such distress by, among other things:

      a.    Failing to properly protect F.P., a minor, from sexual abuse;

      b.    Improperly protecting F.P., a minor, from sexual abuse;

      c.    Failing to investigate, correct and/or otherwise address the openly

pervasive environment of sexual harassment and sexual objectification of its female

students by its male students;

      d.    Failing to investigate, prohibit, and/or otherwise address the Senior Salute

tradition that emerged from this environment, even after a Senior Salute invitation was

directed toward the Rector's wife;

     e.     Failing to investigate, prohibit, and/or otherwise address references to "scoring" made in student publications;

     f.     Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

     g.     Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

     h.     Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

     i.     Failing to promptly report F.P.'s sexual assault to the authorities;

     j.     Failing to take any action to prevent retaliation against F.P. when she returned to the school;

     k.     Failing to conduct an exit interview with F.P. when she left the school; and

     l.     Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies.

**ANSWER:**   Denied.

160.    Defendant's conduct was extreme and outrageous, and intentionally or recklessly caused F.P. severe emotional distress.

**ANSWER:**   Denied.

161.   Defendant's conduct was so outrageous in character, and so extreme in degree, that it exceeds all possible bounds of decency, is atrocious, and is utterly intolerable in a civilized community.

**ANSWER:**   Denied.

162.   Defendant's conduct was wanton, malicious, or oppressive, in that, the school exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

**ANSWER:**   Denied.

163.   Defendant purposefully intended to cause, or recklessly disregarded the high probability of causing, a disturbance of F.P.'s emotional tranquility that was so severe that harmful physical consequences resulted.

**ANSWER:**   Denied.

164.   As a direct and proximate result of Defendant's malfeasance and nonfeasance F.P. experienced, and continues to experience, severe emotional distress accompanied by objective physical manifestations or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**ANSWER:**   Denied.

## COUNT FIVE

*Negligent Infliction of Emotional Distress*

165.   Plaintiffs incorporate all the foregoing allegations as if fully set forth herein.

**ANSWER:**   The School incorporates its answers to all of the foregoing paragraphs as if fully set forth herein.

166.     Defendant had a duty to F.P. to refrain from engaging in the above-described conduct that it knew, or should have known, would foreseeably cause emotional distress to her.

**ANSWER:**     The allegations in paragraph 166 constitute legal conclusions to which no answer is required.

167.     Defendant's negligent conduct included, among other things:

a.     Failing to properly protect F.P., a minor, from sexual abuse;

b.     Improperly protecting F.P., a minor, from sexual abuse;

c.     Failing to investigate, correct, and/or otherwise address the openly pervasive environment of sexual harassment and sexual objectification of its female students by its male students;

d.     Failing to investigate, prohibit, and/or otherwise address the Senior Salute tradition that emerged from this environment, even after a Senior Salute invitation was directed toward the Rector's wife;

e.     Failing to investigate, prohibit, and/or otherwise address references to "scoring" made in student publications;

f.     Failing to investigate, prohibit, and/or otherwise address the formation of the Slaymakers, particularly given their illicit use of SPS facilities for sexual exploits and use of SPS email, networks, Internet connections, and other devices to ritualize, coordinate, and otherwise openly discuss those exploits;

g.     Ignoring and/or otherwise failing to properly address complaints about numerous instances of senior men "seeking" 9th grade girls in an "inappropriate manner" in or near the girls' dorms, despite details of those acts having been discussed in emails between SPS employees;

h.      Ignoring and/or otherwise failing to properly address at least one specific complaint about Labrie acting "overly aggressive" during a sexual experience with a SPS female student;

i.      Failing to promptly report F.P.'s sexual assault to the authorities;

j.      Failing to take any action to prevent retaliation against F.P. when she returned to the school;

k.      Failing to conduct an exit interview with F.P. when she left the school; and

l.      Failing to heed numerous warnings regarding after-hours security and lax disciplinary policies.

**ANSWER:**   Denied.

168.    As a direct and proximate result of Defendant's negligence, F.P. was sexually assaulted and harassed.

 **ANSWER:**   Denied.

169.    By these various negligent acts, Defendant unreasonably subjected F.P. to a foreseeable risk of emotional harm.

**ANSWER:**   Denied.

170.    Defendant's conduct was wanton, malicious, or oppressive, in that, Defendant exhibited reckless indifference to or disregarded the foreseeable risks of harm and acted with ill will, hatred, hostility, a bad motive, or the intent to abuse its power.

**ANSWER:**   Denied.

171.    As a further direct and proximate result of Defendant's malfeasance and nonfeasance, F.P. experienced, and continues to experience, severe emotional distress

accompanied by objective physical manifestations or symptoms (such as nausea, vomiting, elevated heart rate, sweating, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

> **ANSWER:** Denied.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' Complaint, and each and every count contained therein, fails to state a cause of action or claim upon which relief can be granted.

2.      Plaintiffs' claims are barred, in whole or in part, by the failure to mitigate the damages claimed on behalf of F.P.

3.      The acts and omissions of Plaintiffs and/or F.P. caused and/or contributed to the alleged damages, thereby barring or reducing the amount of recovery under the doctrines of contributory negligence and/or comparative negligence.  Plaintiffs' recovery, if any, therefore is barred or should be apportioned in accordance with applicable law.

4.      The alleged injuries sustained by F.P., if any, were caused, in whole or in part, by pre-existing physical, medical, and/or physiological conditions, for which the School has no legal responsibility.

5.      The injuries and damages claimed by Plaintiffs on behalf of F.P., if any, resulted from an intervening or superseding cause and/or causes, and any act or omission on the part of the School was not the proximate and/or competent producing cause of such alleged injuries and damages.

6.      The injuries and damages claimed by Plaintiffs on behalf of F.P., if any, are barred or must be reduced because those damages arose from the acts or omissions of persons or entities other than the School for whom the School has no legal responsibility.

7.      Plaintiffs' Complaint fails to join indispensable parties necessary for the just adjudication of this matter.

8.      Plaintiffs' Complaint fails to state a claim upon which relief can be granted for punitive or enhanced compensatory damages.  RSA 507:16 ("No punitive damages shall be awarded in any action, unless otherwise provided by statute.").

9.      The School denies any conduct for which punitive or enhanced compensatory damages could or should be awarded.

10.     Plaintiffs' claims for negligence are barred based upon the doctrine of comparative negligence.  RSA 507:7-d.

11.     If it is determined that, as alleged in the Complaint, F.P. was injured or damaged, which the School expressly denies, any award of damages must be reduced in proportion to the percentage of fault attributable to the negligence or fault of third parties not named in the Complaint.  Specifically, the School asserts that F.P.'s alleged injuries or damages were proximately caused by others.  As such, Plaintiffs' recovery, if any, must be apportioned in accordance with applicable law.  *See DeBenedetto v. CLD Consulting Engineers, Inc.*, 153 N.H. 793, 804 (2006).

12.     Plaintiffs' have waived, in whole or in part, the claims they assert in their complaint.

13.     Plaintiffs are estopped, in whole or in part, from asserting the claims in their complaint.

14.     The School reserves the right to amend and add to its affirmative defenses as its investigation of this matter and discovery proceeds.

WHEREFORE, defendant St. Paul's School respectfully requests that this Court dismiss this action against it with prejudice, enter judgment in its favor and against plaintiffs, and grant is such other relief as the Court deems just and equitable.

## JURY TRIAL

St. Paul's School demands a trial by jury on all issues so triable.

Respectfully submitted,

ST. PAUL'S SCHOOL,

By its attorneys,

McLANE MIDDLETON,
PROFESSIONAL ASSOCIATION

Dated: September 9, 2016          By: s/Michael A. Delaney
                                      Bruce W. Felmly, NH Bar No. 787
                                      Michael A. Delaney,  NH Bar No. 10504
                                      900 Elm Street
                                      Manchester, NH 03105
                                      T) (603) 625-6464
                                      F) (603) 625-5650
                                      bruce.felmly@mclane.com
                                      michael.delaney@mclane.com

Certificate of Service

I certify that, on September 9, 2016, I served the foregoing via ECF electronic transmission in accordance with the Court's Administrative Procedures for ECF to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants, if any.

/s/ Michael A. Delaney
Michael A. Delaney,  NH Bar No. 10504

11190488